**MANAGEMENT COMMITTEE OF GRAYSTONE PINES HOMEOWNERS ASSOCIATION on Behalf of the OWNERS OF the CONDOMINIUMS, Plaintiff and Appellant,**

v.

**GRAYSTONE PINES, INC., a Utah corporation, Melvin H. Jensen, Robert R. Busch and Ronald Coulam, Individuals, Defendants and Respondents.**

No. 17421.

Supreme Court of Utah.

July 20, 1982.

Robert J. DeBry, Salt Lake City, for plaintiff and appellant.

Max Wheeler, Stephen Roth of Show, Christensen & Martineau, Salt Lake City, for defendants and respondents.

HALL, Chief Justice:

Plaintiff brought this action seeking damages for alleged defects and deficiencies in the construction of residential condominiums. At the close of all of the evidence, the trial court directed a verdict in favor of defendants and plaintiff appeals.

In directing a verdict, the court is not free to weigh the evidence and thus invade the province of the jury, whose prerogative it is to judge the facts.[1] A directed verdict is only appropriate when the

---

1. *Winters v. W.S. Hatch Company,* Utah, 546    P.2d 603 (1976).

court is able to conclude, as a matter of law, that reasonable minds would not differ on the facts to be determined from the evidence presented.[2]

■ This Court's standard of review of a directed verdict is the same as that imposed upon the trial court. We must examine the evidence in the light most favorable to the losing party, and if there is a reasonable basis in the evidence and in the inferences to be drawn therefrom that would support a judgment in favor of the losing party, the directed verdict cannot be sustained.[3]

Application of the foregoing principles of law causes us to conclude that the trial judge erred in directing a verdict in this case.

Defendant Graystone Pines, Inc., was organized for the purpose of developing and marketing a condominium complex known as Graystone Pines Condominiums. Defendants Robert Busch, Melvin Jensen and Ronald Coulam were shareholders and served as the officers and directors of the corporation. Construction of the condominiums was completed between January and April, 1976, and all units were sold and occupied by the following summer.

Plaintiff was organized primarily for the purpose of maintaining the common areas of the condominiums. It brought this action on behalf of the unit owners,[4] seeking damages for defendants' alleged failure to: 1) construct curb and gutter; 2) construct walls in compliance with fire safety standards; 3) repair roof leaks; 4) repair basement leaks; and 5) eliminate the source of and remove a "black substance" from carpets. Its claims were based upon breach of express and implied warranties, contract[5] and fraud. The claim of fraud was predicated upon a theory of "alter ego" and was directed against the named officers, directors and shareholders based upon their alleged withdrawal of the money assets of the corporation for their individual use at a time when plaintiff's damage claims were pending.

The evidence adduced at trial, which for the purposes of this appeal must be viewed in the light most favorable to plaintiff, is as follows:

In January of 1977, official complaints were made by plaintiff to defendants concerning roof leaks in the common areas, as well as in a number of the individual units. These leaks reportedly occurred during periods of precipitation.

Due to defendants' alleged inaction on the matter, plaintiff proceeded on its own to hire a roofer to make the repairs, and paid for his services. The initial repairs did not, however, solve the problem. The roofer was called back a number of times and some of the homeowners themselves attempted to remedy the defects. All were unsuccessful.

Finally, plaintiff consulted an engineering firm for a solution. The firm suggested that the only way to permanently resolve the problem would be to replace the roof entirely. Defendants rejected that proposal and hired their own roofing expert to analyze the problem. His opinion was that the defective condition could be remedied by less expensive and drastic means. Defendants offered to pay for the repairs if done according to their expert's recommendations. However, plaintiff chose to have the roof replaced in accordance with its expert's specifications and, consequently, had to pay for the project.

After a fire occurred in the condominiums, certain surface walls were removed leaving the interior structure of the walls exposed. An expert engineer, hired by plaintiff, examined the exposed walls and discovered certain fire safety defects. He

2. *Id.; Roylance v. Davies,* 18 Utah 2d 395, 424 P.2d 142 (1967).

3. *Little America Refining Co. v. Leyba,* Utah, 641 P.2d 112 (1982); *Kim v. Anderson,* Utah, 610 P.2d 1270 (1980); *Asay v. Rappleye,* Utah, 593 P.2d 132 (1979).

4. Pursuant to the provisions of U.C.A., 1953, 57-8-33.

5. Plaintiff's contract claim was dismissed during trial and no contention is raised in regard thereto on this appeal.

reported that the holes in the studs and plates which held various pipes and vents were too large and were unsealed in violation of the Uniform Building Code. He testified that where the holes are not sealed, a fire can suck additional oxygen into the flame. It was his opinion that the oversized holes could have been properly sealed with a silicone caulking substance.

Defendants' expert testified that the holes were not large enough to require "fire stops" and therefore were not in violation of the Uniform Building Code. Further expert testimony was presented to discount the firestopping method proposed by plaintiff's expert.

Approximately forty cracks developed in the foundational walls of the condominium complex, causing water to leak into the basement. The homeowners complained of the problem to defendants, who promised to repair the cracks. Defendants patched the initial cracks from the inside. When the problem continued, a dispute ensued as to the appropriate method of repairing the foundational cracks. Plaintiff's expert testified that the cracks would have to be repaired from the outside if there were structural defects. Defendants maintained that the leakage was caused by improper sloping in the terrain surrounding the condominiums, and that it was plaintiff's duty to reslope the ground to avert the drainage from the walls. Subsequent repairs were made by plaintiff at its expense. At the time of trial, several of the cracks were still leaking.

Defendants originally had intended to construct curb and gutter on 2700 South Street adjacent to the north boundary of the condominium property. This intention was expressed in a number of ways, including a sales brochure containing a line drawing of curb and gutter in the project, representations by defendants to purchasers, provision in the initial project budget for curb and gutter, and representations by defendants to the city and county.

The curb and gutter improvements were not made because of the city's apparent intention to regrade the road. It was de-fendants' contention that the money originally allocated for that purpose was then used to build extra storage lockers which plaintiff could rent to the homeowners in order to acquire a fund to pay any future assessment for curb and gutter construction. Prior to the trial, the city assessed the cost of the curb and gutter against the homeowners.

■ At trial, on motion of plaintiff stipulated to by defendants, the trial judge dismissed plaintiff's "black substance" claim with prejudice. On this appeal, plaintiff contends that the dismissal went only to the claim as supported by *implied* warranty and that the claim as supported by *express* warranty survived. We conclude to the contrary in light of the following unequivocal statement of counsel for plaintiff which appears in the record:

> I think the stipulation between counsel is clear that we, plaintiff, moves for an involuntary non-suit or a dismissal with prejudice only with respect to the allegation, that portion of the complaint that deals with the black substance.

■ In support of its alter ego theory, plaintiff presented evidence that the defendant corporation was undercapitalized; that its capital requirements were met by notes co-signed by the individual defendants; that its business was conducted as that of a partnership; that the individual defendants received checks from the defendant corporation designated "partners draw"; that the defendant corporation was not governed by any by-laws in existence; that no formal corporate meetings were held; and that individual defendants withdrew substantial corporate assets as "draws, bonuses, or management fees" at a time when plaintiff was attempting to recover on its claims.

The foregoing evidence raised substantial issues of fact as to the alleged defects that could only be determined by the jury as fact-finder. Therefore, it was error for the trial judge to rule against plaintiff, as a matter of law, and to direct a verdict in favor of defendants.

Turning now to the issues raised as to the existence of warranties, the evidence at trial also was that on several occasions, both oral and written statements were made by defendants regarding the existence of a one-year warranty, and that on one occasion it was represented that the warranty covered the leaking roof and basement, the black substance and the curb and gutter. Defendants' noncompliance with fire safety standards was not specifically discussed as a warranty item, but plaintiff's evidence was that the walls were constructed in violation of the fire code. It was also undisputed that all of the various defects complained of appeared within the one-year warranty period.

Defendants acknowledged the existence of an *implied* warranty of workmanship and habitability, contending that their express recognition of such a warranty did not convert it into an *express* warranty of broader proportions. Therefore, the issue at trial was as to the *scope* of the warranty, not whether a warranty existed at all. Nevertheless, the trial judge directed a verdict that no express warranty existed, reasoning that plaintiff's theory of reliance on the alleged warranty was unsound.

█ It is generally true that reliance is necessary to establish a cause of action for express warranty.[6] It is also true that the existence of reliance, as well as the express warranty itself, is a factual issue to be determined by the fact-finder.[7]

█ Plaintiff's evidence of reliance was that the original express warranty was given to induce the unit owners to form the plaintiff association and that the plaintiff association was in fact formed in reliance upon the promised warranty. This evidence was sufficient to give rise to a factual issue on the question of reliance. The evidence pertaining to the scope of the express warranty is obviously conflicting and therefore, the issue should have been submitted to the jury for determination.

The directed verdict is vacated and set aside and the case is remanded for a new trial on all issues, including the scope of the warranty, except that the "black substance" issue need not be addressed since it was heretofore dismissed with prejudice on stipulation. Costs to plaintiff.

STEWART, OAKS, HOWE and DURHAM, JJ., concur.

---

**6.** See, *e.g., Shippen v. Bowen,* 122 U.S. 575, 7 S.Ct. 1283, 30 L.Ed. 1172 (1887).

**7.** See, *e.g., Pacific Marine Schwabacher, Inc. v. Hydroswift Corp.,* Utah, 525 P.2d 615, 619 (1974); *Park v. Moorman Manufacturing Co.,* 121 Utah 339, 241 P.2d 914, 919 (1952).