1999 UT 104

Badi MAHMOOD, Plaintiff and Appellee,

v.

Dorothy ROSS, in her capacity as personal representative of the Estate of Galen Ross, deceased, Defendant and Appellant.

No. 970214.

Supreme Court of Utah.

Nov. 9, 1999.

E. Barney Gesas, Bridget K. Romano, Salt Lake City, for plaintiff.

Warren Patten, Salt Lake City, for defendant.

HOWE, Chief Justice:

## INTRODUCTION

¶ 1 Defendant Dorothy Ross, in her capacity as personal representative of the Estate of Galen Ross, deceased, appeals from the district court's judgment in favor of the plaintiff, Badi Mahmood. The judgment was entered pursuant to a jury verdict which found that Galen Ross had breached a settlement agreement with Mahmood, and which awarded Mahmood over $796,360.79 in direct and consequential damages.

## BACKGROUND

¶ 2 In 1980, Galen Ross and William Bass introduced Badi Mahmood to a business opportunity involving the purchase of real estate in New Mexico. Thereafter, Ross, Bass, and Mahmood entered a partnership and each agreed to contribute money toward the purchase of the real estate. Mahmood made his portion of the capital contribution, but Ross and Bass claimed they would be unable to make their capital contributions without borrowing money.

¶ 3 Ross and Bass asked Mahmood if he would personally borrow the full purchase price of the real estate. Ross suggested that he could help Mahmood obtain a loan through Equitable Life & Casualty Insurance Company ("Equitable"), a company where Ross and Bass were officers, directors, and shareholders. Ross and Bass represented to Mahmood that they could not borrow from Equitable because of the positions they held, but they agreed that if Mahmood would borrow the amount of their capital contributions, they would personally repay him.

¶ 4 Subsequently, Mahmood obtained a real estate loan from Equitable in the amount of $163,000. As security for the loan, Mahmood executed a trust deed pledging approximately 633 acres of property he owned in Woodlands, Wasatch County, Utah (the "Woodlands property"). Mahmood kept $79,000 from the loan; Ross and Bass received the balance.

¶ 5 Eventually, the business opportunity involving the New Mexico real estate failed. Mahmood subsequently paid his portion of the Equitable loan, but Ross and Bass failed to make any payments. Consequently, the loan fell into default and Equitable began foreclosure proceedings on the Woodlands property. Mahmood filed an action against Equitable to block the foreclosure. He also filed suit against Ross, seeking to recoup the portion of the loan proceeds which Ross had agreed to personally pay to Mahmood.

¶ 6 Mahmood settled with Equitable in May 1989. The settlement included a renegotiation of the loan, and Mahmood signed a new five-year trust deed note requiring him to pay $263,000 to Equitable. This second trust deed note included the unpaid balance of the 1980 real estate loan, including penalty, interest, and Equitable's cost and fees. The terms of the note included monthly payments of $1,005.58 for sixty months, with a balloon payment of $258,593.58 due on May 1, 1994. This new note was also secured by Mahmood's Woodlands property.

¶ 7 In August 1990, Mahmood settled his action against Ross. Under the terms of a "Mutual Release and Settlement Agreement," Ross agreed to pay Mahmood the sum of $75,000. Ross's payments were as follows: $13,700.36 payable to Equitable on Mahmood's behalf; $21,299.64 attributable to Mahmood's litigation expenses; and the remaining $40,000 to be paid to Equitable on Mahmood's behalf in monthly installments of $1,000 for forty months.

¶ 8 Pursuant to the terms of the settlement agreement, from October 1990 to August 1991, Ross paid the majority of his $1,000 monthly installments to Equitable according to the terms of the settlement. However, Ross eventually became delinquent in his monthly payments, and Mahmood was served with a notice of default in March 1992. Under pressure from Mahmood's attorney, Ross

cured the March 1992 default. However, Ross again failed to make timely payments, and in August 1992, Mahmood received another notice of default from Equitable.

¶ 9 Neither Ross nor Mahmood made any payments on the loan before the reinstatement deadline, and on December 19, 1992, Mahmood was served with a notice of trustee's sale. The trustee's sale was scheduled for January 22, 1993. Thereafter, Ross tendered the delinquent payments to Equitable, but it refused to accept the tender. Ross then tendered the delinquent payments to Mahmood, but Mahmood also refused them.

¶ 10 In January 1993, Mahmood filed a bankruptcy petition seeking a temporary restraining order to prevent the trustee's sale. He also filed this lawsuit against Ross. Because of Mahmood's bankruptcy petition, the trustee's sale scheduled for January 22, 1993, did not occur. Mahmood subsequently dismissed his bankruptcy petition. Shortly thereafter, Equitable served Mahmood with a new notice of trustee's sale set for April 29, 1993.

¶ 11 On April 28, 1993, Mahmood secured a temporary restraining order stopping the scheduled trustee's sale. On May 6, 1993, Mahmood and Equitable reached an agreement whereby Mahmood paid $18,430.35 in satisfaction of delinquent payments, penalty interest, and Equitable's reinstatement costs and attorney fees. In return, Equitable agreed to reinstate Mahmood's trust deed note and cancel the default and trustee's sale. Following this reinstatement, Mahmood made all of the monthly payments on the note. Ross did not make any further payments as required by the 1990 settlement agreement. In addition to making the monthly payments to Equitable, Mahmood attempted to market, sell, or enter into a

joint venture to develop on the Woodlands property. However, these attempts failed, and on May 6, 1994, Mahmood received notice from Equitable that the balloon payment of $258,593.58 was due. On May 31, 1994, Equitable served Mahmood with a notice of default; he was served with a notice of trustee's sale ninety days later. Despite Mahmood's attempts to block the trustee's sale,[1] on May 8, 1995, Equitable foreclosed on the Woodlands property.[2]

¶ 12 Following the sale of the Woodlands property, Mahmood amended his complaint against Ross to include a cause of action to recover his lost equity in the Woodlands property. In a grant of partial summary judgment, the trial court held that by failing to make all forty monthly payments of $1000, Ross had breached his 1990 settlement agreement with Mahmood. A jury trial on the remaining issues was held in May 1996.[3]

¶ 13 At the conclusion of Mahmood's case in chief, and again at the conclusion of the evidence, defendant moved for directed verdicts contending: (1) there was no evidence to sustain a finding that Ross's breach of the 1990 settlement agreement caused Mahmood to lose his equity in the Woodlands property; (2) Mahmood failed to produce evidence that Mahmood's loss of the Woodlands property was a foreseeable consequence of a breach at the time they contracted; and (3) Mahmood failed to mitigate his damages. Ross's motions were denied, and these issues were left to the jury.

¶ 14 The jury returned a verdict in favor of Mahmood, finding that (1) Ross's breach of the 1990 settlement agreement caused Mahmood damages in the amount of $6,360.99 for reinstatement of his Equitable loan in May 1993; (2) Ross's breach of the 1990 settlement agreement caused Mahmood conse-

---

1. The record notes that the day Mahmood received the notice of default he sent a letter to Equitable offering to pay $25,000, plus all monthly payments for a one-year extension on the loan. Equitable declined. On July 12, 1994, Mahmood again offered to pay $25,000 to Equitable for a one-year extension. Equitable also declined this second offer. In May 1995, in a final effort to preserve his property, Mahmood filed a bankruptcy petition. However, on May 8, 1995, the bankruptcy court granted Equitable's

motion to lift an automatic stay on the Woodlands property.

2. Equitable was the sole and successful bidder at the trustee's sale of Mahmood's Woodlands property.

3. Ross passed away before the trial. Dorothy Ross, in her capacity as personal representative of the Estate of Galen Ross, deceased, was substituted for Ross at trial.

quential damages in the amount of $770,200 for the loss of Mahmood's equity in the Woodlands property. The jury found that Mahmood made reasonable attempts to mitigate the reinstatement costs and the loss of equity in the Woodlands property.

¶ 15 After the entry of the jury's verdict, defendant moved the court for a judgment notwithstanding the verdict ("JNOV"). She contended that she should be granted a JNOV, or in the alternative a new trial, because there was no evidence to support the jury's finding that Ross's breach had caused Mahmood direct or consequential damages in either the reinstatement costs of his Equitable loan or the loss of equity in the Woodlands property. She asserted that the evidence did not demonstrate that Mahmood had taken all reasonable steps to mitigate his damages. The motion was denied, and final orders reflecting the jury's verdict were entered. Defendant now appeals from those final orders.

## STANDARD OF REVIEW

¶ 16 When reviewing any challenge to a trial court's denial of a motion for directed verdict, we review " 'the evidence and all reasonable inferences that may fairly be drawn therefrom in the light most favorable to the party moved against, and will sustain the denial if reasonable minds could disagree with the ground asserted for directing a verdict.' " *White v. Fox*, 665 P.2d 1297, 1300 (Utah 1983) (quoting *Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1165 (Utah 1983)); *see also Management Comm. v. Graystone Pines, Inc.*, 652 P.2d 896 (Utah 1982). As "[t]his Court's standard of review of a directed verdict is the same as that imposed upon the trial court," *Graystone Pines*, 652 P.2d at 898, we review the trial court's decision to determine if the evidence at trial raised a question of material fact which precluded judgment as a matter of law.

## ANALYSIS

### I. DIRECTED VERDICTS

¶ 17 Defendant Dorothy Ross first contends that the trial court erred in failing to grant her motion for directed verdict regarding consequential damages and mitigation of damages. Before we address this assignment of error, we must examine the law of directed verdicts.

¶ 18 "Under Utah law, a party who moves for a directed verdict has the very difficult burden of showing that *no* evidence exists that raises a question of material fact." *Alta Health Strategies, Inc. v. CCI Mechanical Serv.*, 930 P.2d 280, 284 (Utah Ct.App. 1996) (citing *Kleinert v. Kimball Elevator Co.*, 905 P.2d 297, 299 (Utah Ct.App.1995)). If there is any evidence raising a question of material fact, judgment as a matter of law is improper. *Id.* Thus, a motion for a directed verdict is "only appropriate when the court is able to conclude, as a matter of law, that reasonable minds would not differ on the facts to be determined from the evidence presented." *Management Comm.*, 652 P.2d at 898. When considering a motion for a directed verdict, the trial court must consider the evidence in the light most favorable to the party moved against, *see Cruz v. Montoya*, 660 P.2d 723, 728–29 (Utah 1983); however, "the court is not free to weigh the evidence and thus invade the province of the jury, whose prerogative it is to judge the facts." *Graystone Pines*, 652 P.2d at 897.

### II. DAMAGES FOR BREACH OF CONTRACT

¶ 19 "As a general rule, legal damages serve the important purpose of compensating an injured party for actual injury sustained, so that she may be restored, as nearly as possible, to the position she was in prior to the injury." *Castillo v. Atlanta Cas. Co.*, 939 P.2d 1204, 1209 (Utah Ct.App. 1997) (citing 25 C.J.S. *Damages* §§ 1, 3 (1966). Typically, there are two types of damages a non-breaching party can recover in an action for breach of contract: "general damages, which flow naturally from the breach, and consequential damages, which, while not an invariable result of breach, were reasonably foreseeable by the parties at the time the contract was entered into." *Id.* (citing *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985)).

¶ 20 To recover consequential damages, a non-breaching party must prove (1) that consequential damages were caused by the contract breach; (2) that consequential damages ought to be allowed because they were foreseeable at the time the parties contracted; and (3) the amount of consequential damages within a reasonable certainty. *Id.* (citing Dan B. Dobbs, *Handbook on the Law of Remedies* § 12.3, at 798 (1973)); *see also Exton Drive–In, Inc. v. Home Indem. Co.,* 436 Pa. 480, 261 A.2d 319, 325–26 (1969) (denying plaintiff's claim for consequential damages where he failed to prove he, in fact, suffered damages), *cert. denied,* 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970); *Billings v. Union Bankers Ins. Co.,* 918 P.2d 461, 466 (Utah 1996) (stating that consequential damages are limited to those reasonably foreseeable or contemplated by the parties when contract was entered into); *Heslop v. Bank of Utah,* 839 P.2d 828, 840–41 (Utah 1992) (same); *Beck,* 701 P.2d at 801 (same).

¶ 21 To determine whether defendant's motions for directed verdict should have been granted by the trial court, we first review the facts in the light most favorable to Mahmood to determine whether there was evidence presented by which a reasonable jury could find that Ross's breach of the settlement agreement proximately caused Mahmood to lose the Woodlands property. If there was, we next determine whether there was evidence that Mahmood's loss of the Woodlands property was a foreseeable consequence of Ross's breach at the time the parties entered the settlement agreement.

### A. Causation

¶ 22 "Proximate cause is 'that cause which, in the natural and continuous sequence[ ](unbroken by an efficient intervening cause), produces the injury and without which the result would not have occurred. It is the efficient cause—the one that necessarily sets in operation the factors that accomplish the injury.'" *Harline v. Barker,* 912 P.2d 433, 439 (Utah 1996) (quoting *Mitchell v. Pearson Enters.,* 697 P.2d 240, 245–46 (Utah 1985) (citations omitted)). Proximate cause is generally determined by an examination of the facts, and questions of

fact are to be decided by the jury. *See Harline,* 912 P.2d at 439. Thus, courts should refuse to grant a directed verdict on issues of causation if there is any evidence which might lead a reasonable jury to find a causal connection between a breach and a subsequent injury. *See Swift Stop, Inc. v. Wight,* 845 P.2d 250, 253 (Utah Ct.App.1992). However, this does not mean that a jury is free to find a causal connection between a breach and some subsequent injury by relying on unsupported speculation. *See Mitchell,* 697 P.2d at 246. Although juries may make deductions based on reasonable probabilities,

> the evidence must do more than merely raise a conjecture or show a probability. Where there are probabilities the other way equally or more potent the deductions are mere guesses and the jury should not be permitted to speculate. The rule is well established in this jurisdiction that where "the proximate cause of the injury is left to conjecture, the plaintiff must fail as a matter of law."

*Sumsion v. Streator–Smith, Inc.,* 103 Utah 44, 132 P.2d 680, 683 (Utah 1943) (citing *Tremelling v. Southern Pac. Co.,* 51 Utah 189, 170 P. 80, 84 (1917)).

¶ 23 In this case, there is no basis for the jury's finding that Ross's breach of the settlement agreement caused Mahmood to lose the Woodlands property. As stated earlier, in the early 1980s Mahmood borrowed money from Equitable to finance a land purchase in New Mexico. Ross, who was Mahmood's partner in the land venture and an officer at Equitable, received money from this loan but was not a signator on the loan. The loan was secured by Mahmood's Woodlands property.

¶ 24 Mahmood subsequently repaid to Equitable the amount he had kept from the loan proceeds. Ross did not repay any amount of the loan proceeds he had received. In time, the loan went into default and Equitable sought to foreclose on the Woodlands property. In 1989, to prevent the foreclosure, Mahmood refinanced the loan with Equitable by signing a five-year promissory note for $263,000. The terms of the note required Mahmood to make monthly payments of $1,005.78

and a balloon payment of $258,593.58 due on May 1, 1994.

¶ 25 In 1990, Mahmood and Ross settled their litigation regarding the failure of Ross to repay the money he had received from the original Equitable loan. The settlement agreement required Ross to pay $1,000 per month for forty months to Equitable on Mahmood's behalf. The effect of the Ross–Mahmood settlement was to give Mahmood just over three and one half years to sell or develop the Woodlands property, or to refinance the Equitable loan before the balloon payment became due. Ross had knowledge that Mahmood owed a balloon payment due May 1, 1994, but may not have known the full amount owing.

¶ 26 Following the settlement agreement with Ross, Mahmood continuously worked toward selling the Woodlands property. In hopes of satisfying his debt with Equitable, he made efforts to improve the marketability of the property by acquiring the necessary rights-of-way, preparing pictorial brochures, listing the property for sale with real estate companies, and attempting to secure joint ventures to develop the property. Mahmood testified that he "made every effort and every attempt" to sell the land and pay Equitable. However, when the balloon payment came due, Mahmood lacked the resources to pay the debt, and the Woodlands property was foreclosed upon.

¶ 27 At trial, Mahmood asserted that Ross's breach of the settlement agreement started a chain of events which seriously impaired his ability to save the Woodlands property by refinancing or selling it before the balloon payment on the Equitable loan became due. Ross countered by asserting that the breach of "his obligation to pay forty monthly payments," according to the terms of his 1990 settlement agreement with Mahmood, "had no direct relationship to Mahmood's obligation to pay Equitable [the] $258,000 [balloon payment] on May 1, 1994." In an effort to prove his contention to the jury, Mahmood presented the testimony of expert mortgage banker Henry Kesler, and Robert Morris, a licensed realtor and owner of the Park City real estate brokerage of Morris & Associates. These experts testified that the notices of default and the notices of trustee's sale severely impacted Mahmood's credit rating and had a material and substantially negative impact on his ability to sell or refinance the Woodlands property. Kesler testified that the notices of default and notices of trustee's sale would have "made it very difficult to borrow from a traditional or reasonable lender," and it would have been difficult for Mahmood "to obtain financing even from a nontraditional lender" who will often charge interest rates which are five or six percent above prime. Morris testified that the threats of foreclosure depressed the sale price of the property since potential buyers would consider it a forced or "fire" sale.

¶ 28 Although the testimony of Mahmood's experts clearly indicates that the notices of default and trustee's sales adversely impacted his credit, and perhaps his ability to refinance the Equitable loan at a reasonable interest rate, neither expert testified that the notices would *prevent* Mahmood from refinancing. Moreover, and perhaps most significantly, Mahmood did not attempt to refinance the Equitable loan with another lender, and by failing to do so, he failed to take the most reasonable step toward saving the Woodlands property from foreclosure. In light of this, it was difficult, if not impossible, for Mahmood to prove that the notices of default—though ultimately cured or canceled long before the balloon payment's due date—rendered Mahmood unable to make the balloon payment and caused the Woodlands property foreclosure. Mahmood admitted that at no time between May 1989 and May 1994 did he have the funds to make the balloon payment. The jury could not have reached its conclusion that Ross's breach of the settlement agreement caused Mahmood to lose the Woodlands property without engaging in unsupported speculation.

¶ 29 We therefore hold that there was insufficient evidence that Ross's breach of the settlement agreement caused Mahmood to lose his equity in the Woodlands property. Thus, the issue should not have been submitted to the jury, and the trial court erred by

not granting defendant's motion for a directed verdict on this issue.

### B. Forseeability

¶ 30 To prove consequential damages, a claimant must not only show a causal link between the breach and the subsequent injury, but he must also show that the injury was reasonably foreseeable or reasonably contemplated by the parties at the time the contract was entered into. *See Ranch Homes, Inc. v. Greater Park City Corp.*, 592 P.2d 620, 624 (Utah 1979). Because Mahmood failed to provide evidence that Ross's breach of the settlement agreement caused Mahmood to lose the Woodlands property, we need not address forseeability.

### III. MITIGATION OF DAMAGES

¶ 31 There is an additional reason why the jury's verdict cannot be sustained. "Damages awarded for breach of contract should 'place the nonbreaching party in as good a position as if the contract had been performed.'" *Anesthesiologists Assoc. v. St. Benedict's Hosp.*, 884 P.2d 1236, 1238 (Utah 1994) (quoting *Alexander v. Brown*, 646 P.2d 692, 695 (Utah 1982)). However, under the doctrine of avoidable consequences the nonbreaching party has an active duty to mitigate his damages, and he "may not, either by action or inaction, aggravate the injury occasioned by the breach." *Utah Farm Prod. Credit Ass'n v. Cox*, 627 P.2d 62, 64 (Utah 1981); *Angelos v. First Interstate Bank*, 671 P.2d 772, 777 (Utah 1983); *see also Anesthesiologists Assoc. v. St. Benedict's Hosp.*, 852 P.2d 1030, 1039 (Utah Ct.App. 1993); *John Call Eng'g v. Manti City*, 795 P.2d 678, 680 (Utah Ct.App.1990); Restatement (Second) of Contracts § 350 (1981).

¶ 32 At the conclusion of Mahmood's case in chief, and again at the close of the presentation of all the evidence, defendant moved for a directed verdict on the issues of mitigation. She specifically contended that Mahmood failed to mitigate damages by (1) not curing the default during the cure period in 1992, and (2) by making no attempt to refinance the Equitable loan with another lender either before or after the balloon payment came due. We will review both of these

contentions in the light most favorable to Mahmood to determine whether there was evidence presented which could lead a reasonable jury to find that Mahmood made sufficient attempts to mitigate the damages of Ross's breach.

¶ 33 Mahmood received a notice of default from Equitable on August 26, 1992, informing him that he had ninety days to cure the default. He did not cure the default, and on October 22, 1992, he received another letter from Equitable informing him that the trust deed note remained in default and the ninety-day cure period would expire on November 26, 1992. On December 19, 1992, Mahmood was issued a notice of trustee's sale on the Woodlands property.

¶ 34 Ross asserts that Mahmood failed to mitigate damages because Mahmood, "with full and complete knowledge of the consequences," allowed the ninety-day cure period to expire without making the delinquent payments or contacting anyone regarding the problem. However, Mahmood testified that he did not merely sit by and allow the cure period to expire. During both direct and cross examinations, Mahmood repeatedly stated that after receiving the notice of default, he contacted the attorney who had represented him throughout the litigation with Ross. The attorney had worked to see that Ross cured a previous default which had occurred in March 1992. When Mahmood received the March 1992 notice of default from Equitable, he called his attorney. Mahmood's attorney then notified Ross's attorney of the default and demanded that Ross immediately cure the default. Mahmood's attorney also contacted an attorney at the firm which had represented Ross while negotiating the 1990 settlement agreement and explained that if Ross did not cure the default, and Mahmood subsequently lost the Woodlands property to Equitable, Mahmood would hold Ross responsible. Thereafter, Ross cured the default. Because Mahmood's attorney had worked to have Ross cure the March 1992 default, Mahmood believed that when he contacted his attorney about the August 1992 notice of default, the attorney would begin working to have Ross cure that default as well.

¶ 35 Despite Mahmood's testimony, whether he in fact contacted his attorney regarding the August 1992 notice of default was heavily challenged by Ross at trial and remained a disputed issue of fact. Mahmood's attorney did not recall being contacted by Mahmood regarding the August 1992 default prior to the notice of trustee's sale which Equitable served on Mahmood in December 1992. However, when the evidence surrounding the August 1992 notice of default is viewed in the light most favorable to Mahmood, there was evidence showing that Mahmood contacted his attorney and believed he was working to have Ross cure the default. Whether or not Mahmood contacted his attorney regarding the August 1992 notice of default and whether this attempt to mitigate was reasonable was a disputed issue of fact, and defendant was not entitled to a directed verdict on this issue.

■ ¶ 36 We next consider Ross's contention that Mahmood failed to mitigate by not attempting to refinance the Equitable loan with another lender either before or after the balloon payment due date. As discussed previously, at trial Mahmood presented the testimony of expert witness Henry Kesler. He testified that based on his experience as a commercial and mortgage banker, the notice of default and notice of trustee's sale on the Woodlands property would have a material and substantially negative impact on Mahmood's ability to refinance the Equitable loan. Although he did not state that it would have been impossible for Mahmood to refinance, Kesler did state that Mahmood would have a very difficult time finding financing through traditional lenders at reasonable interest rates. Additionally, Mahmood presented evidence that he sought to mitigate damages by attempting to market and sell the Woodlands property. Specifically, he listed the property with realtors, acquired rights-of-way to the property, distributed sales brochures, and actively sought partners to enter into a joint venture to develop the property. In October, 1994, Mahmood received an offer to sell one-half of the Woodlands property for $300,000. Mahmood considered this offer to be below the market price of the land and counter offered to sell one-third of the Woodlands property for $318,000. However, the counter offer was rejected by the prospective buyer, and no additional offers to purchase the property were made.

¶ 37 Although Mahmood presented testimony that the notices of default and trustee's sale may have negatively impacted his credit and made it more difficult for him to refinance the balloon payment, Mahmood did not attempt to refinance the Equitable loan with another lender. Moreover, Mahmood received the offer to purchase half the Woodlands property after he had been served with both the notice of default for failure to make the balloon payment and the subsequent notice of trustee's sale, but within ample time to accept the offer, obtain the proceeds, and prevent the foreclosure sale. Although the offered price would have covered the amounts owed to Equitable, and still left Mahmood with title to half of the Woodlands property, he rejected the offer. This evidence not only demonstrates that Mahmood failed to mitigate his damages, but it also shows that Ross's default did not cause Mahmood's loss of the Woodlands property. Consequently, Ross's motion for a directed verdict as to mitigation of any consequential damages should have been granted.

## CONCLUSION

■ ¶ 38 This is a case for breach of contract. "For breach of contract the law of damages seeks to place the aggrieved party in the same economic position he would have had if the contract had been performed." John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 14–4, at 591 (3d ed.1987). Here, the contract Ross breached was the August 1990 settlement agreement wherein he agreed to pay forty monthly payments of $1,000 to Equitable on Mahmood's behalf. Ross paid only some of those forty installments. Thus, if Mahmood is to be placed in the same position as he would have been in had the contract been performed, he is entitled to judgment against Ross for the amount of the unpaid installments and other amounts owing to Mahmood under the 1990 settlement agreement.

¶ 39 We conclude the issues of causation and mitigation of damages were improperly left to the jury. The trial court erred by not granting Ross's motion for a directed verdict. Therefore, we reverse the judgment below and remand the case to the trial court with instructions to enter judgment against the defendant for $20,000 representing the actual damages caused by the breach of the 1990 settlement agreement, plus interest, and $6,360.99, plus interest, representing Mahmood's reinstatement costs.

¶ 40 Associate Chief Justice DURHAM, Justice ZIMMERMAN, and Justice RUSSON concur in Chief Justice HOWE's opinion.

¶ 41 Justice STEWART dissents.

