2015 UT App 165

## THE UTAH COURT OF APPEALS

TERRY B. BRODKIN,
Plaintiff and Appellant,

*v.*

TUHAYE GOLF, LLC; AMEAGLE PC HOLDINGS, INC.; PARK PREMIER
MINING CO.; ROBERT W. DUNLAP; AND KATHY DUNLAP,
Defendants and Appellees.

Opinion
No. 20130548-CA
Filed June 25, 2015

Fourth District Court, Heber Department
The Honorable Derek P. Pullan
No. 070500421

Steve K. Gordon and Jarom B. Bangerter, Attorneys
for Appellant

Stephen J. Hill, Attorney for Appellees Park Premier
Mining Co., Robert W. Dunlap, and Kathy Dunlap

Clark K. Taylor and Nicole M. Deforge, Attorneys for
Appellees Tuhaye Golf, LLC and Ameagle PC
Holdings, Inc.

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES JAMES Z. DAVIS and JOHN A. PEARCE concurred.

VOROS, Judge:

¶1      Terry B. Brodkin appeals from the district court's grant of
summary judgment in favor of Tuhaye Golf LLC; Ameagle PC
Holdings Inc.; Park Premier Mining Co.; and Robert and Kathy
Dunlap (Defendants). The district court ruled as a matter of law
that Brodkin was not an intended third-party beneficiary of a
contract that did not mention him or purport to bestow any
benefit on him. We affirm.

BACKGROUND

¶2     This case concerns approximately fifty-two acres of real property overlooking Jordanelle Reservoir in Wasatch County. Brodkin now owns the property, but for some seventy-five years Progress Corporation owned the property, which the parties, the district court, and now we refer to as the Progress Parcel.

¶3     In the early 1990s, the federal government condemned most of the land down-slope from the Progress Parcel to create Jordanelle Reservoir. The completed reservoir inundated the Progress Parcel's only road access. The United States government compensated Progress Corporation, and Progress "release[d] and relinquish[ed] to the United States any and all easements or rights of way or access to [the Progress Parcel] . . . taken by reason of the acquisition of land by the United States for the construction, maintenance, and operation of the Jordanelle Dam and Reservoir project." The Progress Parcel thus became landlocked, surrounded by property owned by Defendants and their predecessors-in-interest in a development known as Area B.

¶4     In the late 1990s, defendant Robert Dunlap, who owned property within Area B, attempted to contact other Area B property owners to coordinate a development plan for the area. Dunlap successfully identified all the owners except Progress Corporation. In 1999, Dunlap and the other Area B owners (except Progress Corporation) formed EastSide Group LLC and executed an operating agreement. The Operating Agreement defines the "Members" of EastSide as the Operating Agreement's original signatories and "such other persons or entities as shall from time to time join in the execution hereof." Progress Corporation never executed the Operating Agreement.

¶5     The Operating Agreement specifies that EastSide's purpose, among other things, is, "[t]o engage in real estate development activities, including, but not limited to, planning, developing, installing and owning the infrastructure (such as

water, sewer and roads) to serve real property in the Jordanelle Basin." The Operating Agreement expressly disclaims any third-party rights or benefits:

> None of the provisions of this Agreement shall be construed as conferring, or allowing, any rights or benefits upon or to any third party (including, but not limited to, the holder of any obligation secured by any real or personal property of [EastSide] or any portion thereof or interest therein, or any other creditor of [EastSide] or of any Member).

The Operating Agreement also requires each Member to "irrevocably covenant[] to grant utility and road easements across their property in Area B to [EastSide], and solely for the benefit of its Members, at no cost," for the development of Area B. Finally, the Operating Agreement requires each Member "to execute a separate written agreement containing this covenant" and to record that separate writing to "give notice that the Members' property in Area B shall be subject to such easements in the future."

¶6    In 2001, certain Area B property owners executed another agreement (the Area B Agreement). The Area B Agreement defines "Area B Landowners" as: Intell Utah LLC; the United States Bureau of Land Management (BLM); Exchange Lands Management Company LLC; Debra Taylor Miller, Lisa Taylor-Anani, Christian Tuft, Tamara Hokanson, and Jody K. Tuft (collectively, Taylor/Tuft); Robert and Kathy Dunlap (the Dunlaps); and Park Premier Mining Co. Each signed the Area B Agreement. The Area B Agreement did not name Progress Corporation as an Area B Landowner, nor did Progress sign the Area B Agreement. Indeed, the signatories were unaware that Progress Corporation owned property within Area B.

¶7    The Area B Landowners owned separate parcels within Area B. In one provision of the Area B Agreement, the parties grant each other reciprocal access easements:

> The parties to this Agreement hereby agree to grant to each other reciprocal, permanent, non-exclusive ingress and egress easements . . . .
>
> As stated herein, the parties to this Agreement have agreed to grant necessary easements to provide access to, from and between the parcels owned by the Area B Landowners . . . .

The Area B Agreement includes a map attached as Exhibit A, showing generally each signatory's parcel. The map does not identify the Progress Parcel or otherwise reflect that Progress Corporation owned any property within Area B. The Progress Parcel lies within a parcel the map identifies as owned by Taylor/Tuft.

¶8      The Area B Agreement also includes a provision for attorney fees. The provision states, "Except as otherwise provided herein, any party to [the Area B Agreement] may enforce this Agreement by legal action and if that party prevails, it shall recover costs and reasonable attorney's fees."

¶9      Before Brodkin offered to buy the Progress Parcel, he obtained a title report. The title report noted that the Progress Parcel may lack road access. The seller also informed Brodkin that if he wanted "egress [and] ingress, you're going to have to work it out." Before Brodkin purchased the Progress Parcel he approached Taylor/Tuft in an effort to acquire access to the Progress Parcel. Taylor/Tuft never executed any agreement granting Brodkin the access he sought. Brodkin then reviewed the Operating Agreement, the Area B Agreement (including the Exhibit A map), and the Wasatch County Master Plan for Area B. Based on his review, Brodkin concluded that the Progress Parcel had road access. In April 2004 he bought the Progress Parcel for approximately $290,000.

¶10      Sometime after the Area B Landowners executed the Area B Agreement, Tuhaye Golf LLC acquired the Intell and

Taylor/Tuft parcels. Tuhaye thereafter executed an agreement with some of the remaining Area B Landowners (the 2004 Agreement). In the 2004 Agreement, "[t]he parties acknowledge and agree that the [Area B Agreement] was intended to grant and provide reciprocal easements over properties owned by . . . Tuhaye[] and other parties to the [Area B Agreement]." Therefore, the parties to the 2004 Agreement "clarify, confirm, and grant the easements . . . referred to and provided and to provide for and implement the other terms and conditions hereof and of the [Area B Agreement]." Brodkin, by then the owner of the Progress Parcel, was not a party to the 2004 Agreement.

¶11   In the next few years, Brodkin received at least two offers to purchase the Progress Parcel, each at a price exceeding ten-fold what he paid for it. In 2006, Brodkin received an offer from Optimum Investments LLC to purchase the Progress Parcel for $5 million (the Optimum Offer). Brodkin asserts that the Optimum Offer failed because it was orally conditioned on Brodkin's acquiring access to the Progress Parcel from the surrounding landowners. However, no express condition to this effect appears in the written Optimum Offer.

¶12   In April 2007, Brodkin received an offer from Tracy Roth for $5.5 million. The Roth offer was "not contingent on any resolution of easement issues." In a letter from Roth to Brodkin summarizing his offer, Roth acknowledged and accepted the Progress Parcel's access issues:

> From what I have been told, the easement issue has been a thorn in the side of the sale of this property. We are comfortable removing any ingress/egress issues for two simple reasons. First, our intentions are to land-bank this property. Second, if we felt the need to sell in the immediate future, the only party we would consider would be Talisker. Therefore, the easement issues to us are not important enough to delay purchase of this

property. Yes, we would like to see them resolved eventually so we can keep our options open; however, we are comfortable extending an offer excluding the resolution of those issues.

Though Brodkin accepted Tracy Roth's offer, the sale never closed. Brodkin eventually "let him walk" based on lack of access because"[i]t wouldn't be otherwise fair or just."

¶13 Shortly after the Roth sale fell through, Brodkin sued Defendants. In his complaint, Brodkin alleged four claims for relief: (1) a declaratory judgment that he is a third-party beneficiary to the Area B Agreement; (2) breach of contract, i.e., breach of the Area B Agreement; (3) easement by necessity; and (4) condemnation. Defendants answered and moved for a judgment on the pleadings on all claims. The district court denied Defendants' motion with respect to Brodkin's first and second claims, but granted the motion with respect to Brodkin's third and fourth claims.[1]

¶14 Defendants later moved for summary judgment on the declaratory relief and breach of contract claims. The district court granted Defendants' motion. The district court ruled, in relevant part, that the Area B Agreement did not clearly and intentionally confer any third-party benefits on Brodkin. The district court then ruled, in the alternative, that even if Brodkin or Progress Corporation were intended third-party beneficiaries to the Area B Agreement, no record evidence established that Defendants caused Brodkin's claimed damages, and that, in any event, Brodkin failed to mitigate his damages. Finally, the district court awarded Defendants costs and attorney fees. Brodkin appeals the summary judgment and the fee award.

---

1. Brodkin does not appeal the district court's dismissal of his third and fourth claims.

ISSUES ON APPEAL

¶15    Brodkin asserts four claims of error on appeal. He contends that the district court erred in (1) ruling that the Area B Agreement is unambiguous, (2) ruling that he is not a third-party beneficiary to the Area B Agreement, (3) ruling that he failed to prove damages for his breach of contract claim, and (4) awarding Defendants their costs and attorney fees.

ANALYSIS

I. Summary Judgment

¶16    Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). We review the district court's "legal conclusions and ultimate grant or denial of summary judgment for correctness and view[] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted).

A.    The Area B Agreement Is Unambiguous.

¶17    Brodkin first contends that the district court erred in ruling on summary judgment that the Area B Agreement is unambiguous. Utah caselaw establishes the following rules for the use of extrinsic evidence in reviewing contractual ambiguities.

¶18    First, if a contract contains no ambiguity,[2] the court will not consider extrinsic evidence and will enforce the contract according to its terms. *See Giusti v. Sterling Wentworth Corp.*, 2009

---

2. For example, "A shall pay to B $100."

UT 2, ¶ 44, 201 P.3d 966 ("Under basic rules of contract interpretation, courts first look to the writing alone to determine its meaning and the intent of the contracting parties.") *holding modified by Central Utah Water Conservancy Dist. v. King*, 2013 UT 13, 297 P.3d 619; *id.* ("If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." (citation and internal quotation marks omitted)).

¶19    Second, if the contract contains a facial ambiguity,[3] the court will consider extrinsic evidence to resolve the ambiguity. *See id.* ("Only where there is ambiguity in the terms of the contract may the parties' intent be ascertained from extrinsic evidence." (citation and internal quotation marks omitted)); *id.* ("A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." (citation and internal quotation marks omitted)).

¶20    Third, if a party contends that an apparently unambiguous contract contains a latent ambiguity,[4] the court will consider extrinsic evidence to determine whether the contract contains a latent ambiguity. *See Watkins v. Henry Day Ford*, 2013 UT 31, ¶ 28, 304 P.3d 841 ("Utah's rules of contract interpretation allow courts to consider any relevant evidence to determine whether a latent ambiguity exists in contract terms that otherwise appear to be [facially] unambiguous." (alteration in original) (emphasis, citation, and internal quotation marks omitted)); *id.* ("While a '[facial] ambiguity arises solely from the terms of the instrument, . . . a latent ambiguity is one not

---

3. For example, "A shall pay to B the usual fee."

4. For example, "A shall pay to B $100," and A contends "$100" meant 100 Canadian dollars but B contends "$100" meant 100 American dollars.

appearing upon the face of the instrument, but is developed by extrinsic evidence.'" (alteration and omission in original) (quoting *Conlam v. Doull*, 9 P. 568, 569 (Utah Terr. 1886)).

¶21    However, extrinsic evidence cannot be used to create an ambiguity not reasonably supported by the text of the contract. *Daines v. Vincent*, 2008 UT 51, ¶ 27, 190 P.3d 1269 ("[A] finding of ambiguity after a review of relevant, extrinsic evidence is appropriate only when reasonably supported by the language of the contract." (citation and internal quotation marks omitted)).

¶22    Fourth, if the court concludes that the contract contains a latent ambiguity, the court will consider extrinsic evidence to resolve the ambiguity. *Fox Film Corp. v. Ogden Theatre Co.*, 17 P.2d 294, 296 (Utah 1932) ("[E]xtrinsic evidence, parol or otherwise, is admissible to explain a latent ambiguity in a writing.").

¶23    Here, Brodkin contends that the district court erred in granting summary judgment because "as a matter of law, the Area B Agreement was, and is, facially ambiguous." Specifically, he argues that "ample evidence" supported his contention that parties to the Area B Agreement intended the Progress Parcel to benefit from its creation of reciprocal easements.

¶24    We see no facial ambiguity in the Area B Agreement. The Area B Agreement clearly states that the parties agree to grant "to each other" reciprocal easements:

> *The parties to this Agreement* hereby agree to grant *to each other* reciprocal, permanent, non-exclusive ingress and egress easements . . . .

> As stated herein, the parties to this Agreement have agreed to grant necessary easements to provide access to, from, and between the parcels owned by the Area B Landowners . . . .

(Emphasis added.) Furthermore, the agreement defines "Area B Landowners" as: Intell Utah LLC; BLM; Exchange Lands Management Company LLC; Taylor/Tuft; the Dunlaps; and Park Premier Mining Co. Thus, by its plain terms, this provision applies only to the parties to the Area B Agreement, who granted easements only to each other. Neither Brodkin nor Progress Corporation was a party to the Area B Agreement or an Area B Landowner as defined in the agreement. Accordingly, by its own terms, the Area B Agreement grants Brodkin nothing. Because the agreement contains no facial ambiguity, the district court properly enforced it according to its terms.

¶25   Despite the plain language of the contract, Brodkin maintains that the attached map could be read to grant him a reciprocal easement as a third-party beneficiary. He argues that the map establishes roads to and from the Progress Parcel even though the map neither mentions Progress Corporation nor identifies the Progress Parcel. In effect, he claims that the map attached to the Area B Agreement creates a latent ambiguity.

¶26   We disagree. The Area B Agreement does not grant easements to parcels, but to contracting parties. That the contracting parties attached a map to the agreement does not alter that fact. And even if it did, the map they attached does not identify the Progress Parcel, because the parties to the Area B Agreement were unaware that the Progress Parcel even existed. So, while the map does contemplate roads to the location on the map where the Progress Parcel exists, those roads evince nothing more than the intent to grant access to Taylor/Tuft, together with a mistaken belief that Taylor/Tuft owned all the property marked with its name on the map.

¶27   Brodkin also relies on extrinsic evidence that, he argues, demonstrates that the parties to the Area B Agreement intended to benefit all Area B property owners regardless of their non-party status. He points to statements by Wasatch County's planning director that an important consideration to Wasatch County in approving an Area B Land Use Plan was "that every

parcel was shown to have [its] own access and the plan conclusively shows that it is possible to get from any parcel [in Area B] to a well-established public road." But, as explained, this representation was made without any awareness that the Taylor/Tuft parcel subsumed the Progress Parcel. So, while this extrinsic evidence may demonstrate a factual mistake, it does not create a latent ambiguity. Nor does it place Brodkin within the circle of the parties to the agreement, who grant "to each other reciprocal, permanent, non-exclusive ingress and egress easements."

B.     Brodkin Is Not a Third-Party Beneficiary to the Area B
       Agreement.

¶28     Brodkin next contends that he is a third-party beneficiary under the Area B Agreement and that the district court erred in ruling otherwise. Because the reciprocal easements created under the Area B Agreement unambiguously benefit only its signatories, the district court did not err.

¶29     A third-party beneficiary is a person "recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 47, 28 P.3d 669 (citation and internal quotation marks omitted). "The existence of third party beneficiary status is determined by examining a written contract." *Wagner v. Clifton*, 2002 UT 109, ¶ 11, 62 P.3d 440 (citation and internal quotation marks omitted). "The written contract must show that the contracting parties clearly intended to confer a separate and distinct benefit upon the third party." *Id.* (citation and internal quotation marks omitted). "[I]t is not enough that the parties to the contract know, expect or even intend that others will benefit from the [contract] . . . . The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear." *SME Indus.*, 2001 UT 54, ¶ 47 (second alteration and omission in original) (citation and internal quotation marks omitted).

¶30    Under these standards, Brodkin's claim fails as a matter of law. As we have already explained, the parties to the Area B Agreement agreed to grant "to each other" reciprocal, permanent, non-exclusive easements of ingress and egress. The text of the Area B Agreement defeats any suggestion that its parties, clearly or otherwise, intended to confer any benefit upon any third party. Indeed—though such knowledge would be insufficient standing alone—the parties were not even aware of Brodkin or his predecessor-in-interest.

C.    Brodkin Has No Legal Right to Enforce the Area B Agreement.

¶31    Brodkin next contends that the district court erred in rejecting his breach-of-contract claim on summary judgment on the basis that he failed to prove damages. The contract in question is the Area B Agreement. Brodkin argues the district court erred in granting summary judgment because he submitted evidence establishing: (1) that Optimum offered to buy the Progress Parcel for $5 million; (2) that the Optimum Offer "was expressly conditioned on Optimum being able to obtain written confirmation from . . . Defendants that necessary easements would be granted"; (3) that Defendants refused to grant access to the Progress Parcel; and (4) the Optimum Offer failed. Brodkin's argument assumes that Defendants had an obligation under the Area B Agreement to grant him easements to access the Progress Parcel, and that Defendants breached the Area B Agreement when they refused to do so. We have already concluded that the parties to the Area B Agreement did not make Brodkin a third-party beneficiary. Accordingly, we conclude that Brodkin has no legal right to enforce the Area B Agreement against Defendants, or otherwise hold them liable for any alleged breach. *See Wagner*, 2002 UT 109, ¶ 13. Accordingly, it is of no consequence whether Brodkin failed to prove damages, because he failed to prove the existence of a contract that he is legally entitled to enforce.

¶32    But even if Brodkin had a legal right to enforce the Area B Agreement as a third-party beneficiary, his breach of contract claim would fail. The district court explained that Brodkin's claim failed because no admissible evidence supported "Brodkin's claim that [Defendants] caused the Optimum Offer not to close" and because "[b]y allowing the $5.5 million dollar purchaser [Roth] to walk, Brodkin could have but failed to mitigate his claimed damages." We agree, at least with respect to the Roth offer. Brodkin admitted that he allowed Roth "to walk" and he does not dispute that Roth waived any access issues. Further, the Roth offer was for $5.5 million—the exact amount of Brodkin's claimed damages. Thus, Brodkin failed to mitigate his damages. *See Mahmood v. Ross*, 1999 UT 104, ¶¶ 31, 36–37, 990 P.2d 933.

¶33    We conclude that the Area B Agreement is unambiguous, that its parties did not "clearly express" an intention to confer third-party benefits on Brodkin, that Brodkin is not a third-party beneficiary to the Area B Agreement as a matter of law, and that he has no legal right to enforce the Area B Agreement. Accordingly, the district court did not err in granting Defendants' motion for summary judgment.

## II. Attorney Fees

¶34    Finally, Brodkin contends that under Utah's reciprocal fee statute the district court erred in awarding Defendants their costs and attorney fees. A challenge to an award of attorney fees on the basis that the relevant contract or statute does not entitle the prevailing party to fees presents a question of law that we review for correctness. *See Hooban v. Unicity Int'l, Inc.*, 2009 UT App 287, ¶ 6, 220 P.3d 485, *aff'd*, 2012 UT 40, 285 P.3d 766.[5]

---

5. We review certain other issues surrounding the award of attorney fees for an abuse of discretion. *See Anderson & Karrenberg v. Warnick*, 2012 UT App 275, ¶ 8 (citing *Reighard v.*

(continued…)

¶35   "As a general rule, attorney fees may be awarded only when they are authorized by statute or contract." *Fericks v. Lucy Ann Soffe Trust*, 2004 UT 85, ¶ 23, 100 P.3d 1200. Utah's reciprocal fee statute allows a court to award costs and attorney fees to the prevailing party in any civil action based upon a contract whose terms allow at least one party to recover fees:

> A court may award costs and attorney fees to either party that prevails in a civil action based upon any promissory note, written contract, or other writing executed after April 28, 1986, when the provisions of the promissory note, written contract, or other writing allow at least one party to recover attorney fees.

Utah Code Ann. § 78B-5-826 (LexisNexis 2012). Here, the Area B Agreement provided for an award of fees to the prevailing party in the event of a dispute:

> Except as otherwise provided herein, any party to [the Area B Agreement] may enforce this Agreement by legal action and if that party prevails, it shall recover costs and reasonable attorney[] fees.

Brodkin argues that because he never claimed to be a party to the Area B Agreement—he only claimed to be a third-party beneficiary—the statute does not apply.

---

(…continued)
*Yates*, 2012 UT 45, ¶ 12, 285 P.3d 1168) (explaining that we review the determination of which party prevailed in a civil action—and thus may be entitled to attorney fees—for an abuse of discretion); *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988) (explaining that we review the calculation of reasonable attorney fees for an abuse of discretion).

¶36    The Utah Supreme Court's decision in *Hooban v. Unicity International, Inc.*, forecloses Brodkin's argument. 2012 UT 40, 285 P.3d 766. In *Hooban*, the Utah Supreme Court held that a party may recover fees under the reciprocal fee statute "when the provisions of a contract would have entitled at least one party to recover its fees had that party prevailed in a civil action based upon the contract." *Id.* ¶ 32 (internal quotation marks omitted). The supreme court explained, "The statute is triggered only when the provisions of the contract would allow at least one party to recover fees if that party had prevailed under its theory of the case." *Bushnell v. Barker*, 2012 UT 20, ¶ 11, 274 P.3d 968.

¶37    Moreover, "an action is 'based upon' a contract under the statute if a 'party to the litigation assert[s] the writing's enforceability as basis for recovery.'" *Hooban*, 2012 UT 40, ¶ 22 (quoting *Bilanzich v. Lonetti*, 2007 UT 26, ¶ 15, 160 P.3d 1041). That condition results when a litigant "rested his claims in the district court on a right to enforce the [contract]" even if he is ultimately "deemed a stranger to the contract" with "no rights to enforce it or obligations under it." *Id.* ¶¶ 22, 24.

¶38    The present case falls within this rule. Brodkin asserted the Area B Agreement's enforceability as his basis for recovery. He alleged that the Area B Agreement "is binding under Utah law," that he "fully performed his obligations under the [Area B Agreement]," that Defendants "refuse[d] to honor the [Area B Agreement] with respect to the Progress Parcel, and refuse[d] to grant [him] access easements as required by the [Area B Agreement,]" that "[t]his refusal to grant easements constitutes a breach of the [Area B Agreement]," and that he "is entitled to recover damages." In fact, Brodkin claimed his own "costs and attorney[] fees for bringing this action." And had he succeeded in his efforts to enforce the contract he would, as he argued below, have been entitled to attorney fees under the attorney fees provision of the Area B Agreement. Accordingly, the district court committed no error in awarding Defendants their costs and attorney fees.

¶39   Our supreme court's decision in *Bushnell v. Barker* does not alter this conclusion. 2012 UT 20, 274 P.3d 968. In *Bushnell*, the supreme court held that a claim against the alter ego of a contracting party does not make that alter ego a defaulting party to the contract, but makes it personally liable for the contracting party's default. *Id.* ¶ 13. Thus, even if the party seeking to enforce the contract prevails, the terms of the contract would not entitle it "to recover attorney fees in the sense required to trigger the statute." *Id.* But the present case presents no alter ego issue.

¶40   In sum, because Defendants, as the prevailing parties, are entitled to their costs and attorney fees, we affirm the district court's award of those costs and fees. In addition, a party entitled to "attorney fees below and [that] prevails on appeal is entitled to fees reasonably incurred on appeal." *Giles v. Mineral Res. Int'l, Inc.*, 2014 UT App 259, ¶ 25, 338 P.3d 825. Accordingly, we remand to the district court for the limited purpose of calculating Defendants' fees reasonably incurred on appeal.

CONCLUSION

¶41   We affirm the district court's grant of summary judgment in favor of Defendants and its award of costs and attorney fees to Defendants. We also award Defendants their fees reasonably incurred on appeal and remand for the district court to determine the amount of those reasonable fees.