**2018 UT App 47**

## THE UTAH COURT OF APPEALS

PATRICIA BECKMAN,
Appellant,

*v.*

CYBERTARY FRANCHISING LLC, FRANCHISE FOUNDRY LLC,
AND CHRISTIAN FAULCONER,
Appellees.

Opinion
No. 20150295-CA
Filed March 22, 2018

Fourth District Court, Provo Department
The Honorable Darold J. McDade
No. 110402922

Andrew W. Stavros and Austin B. Egan, Attorneys
for Appellant

Daniel K. Brough and James C. Dunkelberger,
Attorneys for Appellees

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and DAVID N. MORTENSEN concurred.

POHLMAN, Judge:

¶1      Patricia Beckman appeals the trial court's judgment in her lawsuit against Cybertary Franchising LLC, Franchise Foundry LLC, and Christian Faulconer (collectively, Defendants). We affirm in part, reverse in part, vacate in part, and remand for further proceedings.

BACKGROUND

¶2      In 2005 Beckman established Cybertary, a company offering virtual administrative services to businesses. At a business conference in 2010, Beckman met Faulconer, a principal

of Franchise Foundry. Franchise Foundry provided marketing services for companies, and Faulconer expressed an interest in marketing for and investing in Cybertary.

¶3     Beckman and Faulconer ultimately negotiated three agreements. First, Beckman, Franchise Foundry, and another entity executed an operating agreement for Cybertary. Second, Cybertary and Franchise Foundry entered into a service agreement under which Franchise Foundry agreed to perform marketing and sales services in exchange for a minority share in Cybertary. Third, Cybertary and Beckman executed an employment agreement (the Employment Agreement) under which Cybertary agreed to employ Beckman as its chief executive officer for a three-year term "[s]ubject to earlier termination as provided in" that agreement. The Employment Agreement set a base salary for Beckman and provided for bonuses and a monthly benefits allowance. The Employment Agreement allowed Cybertary to terminate Beckman's employment for "cause" and enumerated seven events that would constitute "cause."

¶4     Beckman's relationship with Cybertary soured, and Cybertary failed to pay her according to the terms of the Employment Agreement. Concurrently, Beckman filed for bankruptcy on May 20, 2011. In Beckman's view, Faulconer was threatening to terminate her employment and was considering buying out her shares of Cybertary through the bankruptcy proceeding. In October 2011, Beckman's counsel sent a letter to Faulconer and a Cybertary manager threatening litigation and demanding that Cybertary pay the amounts it owed Beckman. Faulconer responded and arranged a phone call "for settlement purposes only."

¶5     On October 19, 2011, Beckman and Faulconer had a ninety-minute phone call, which Beckman recorded (the October conversation). At the beginning of the call, Faulconer stated, "This whole conversation . . . is really just for settlement purposes only . . . ." Beckman acknowledged this preface, stating, "Now you said this discussion is for settlement purposes

only," and, "If . . . this entire discussion is aiming towards a settlement, what is it that you propose?" She and Faulconer then candidly discussed Beckman's grievances but did not resolve them.

¶6     On November 2, 2011, Beckman sued Cybertary. Beckman alleged claims for breach of contract and unjust enrichment based on Cybertary's failure to pay her base salary and benefits allowance. Because Beckman expected that all amounts owed to her before May 2011 would be addressed in the bankruptcy proceeding, she sought compensation only for those amounts that came due after her bankruptcy filing.

¶7     Two weeks later, on November 14, 2011, Cybertary formally notified Beckman that, "effective immediately," it was terminating her employment for cause. The notice cited three subsections of the Employment Agreement's termination provision to support its determination of cause: subsections 6(b)(ii), (iii), and (vi).[1] As evidence of cause, Cybertary explained that it had reason to believe that Beckman had engaged in certain conduct that discredited Cybertary or was detrimental to its reputation or its results of operation or

---

1. Those provisions are as follows:

> (ii) Executive's willful breach, habitual neglect, gross neglect, or dereliction of Executive's duties under this Agreement;
> (iii) Executive's material misconduct with regard to the Company, including, but not limited to, Executive's failure to comply with Company's written rules and policies; . . .
> (vi) Any conduct, whether dishonest, fraudulent, or otherwise, that discredits the Company or is detrimental to the reputation of the Company or the Company's results of operations or business . . . .

business, pursuant to subsection 6(b)(vi). Cybertary further explained,

> Not only does that [particular] conduct fall squarely within Section 6(b)(vi) . . . and its prohibition on conduct that harms Cybertary's reputation or operations, but [it] also constitutes "gross neglect" or "dereliction" of your duties pursuant to Section 6(b)(ii) . . . , as well as "material misconduct with regard to" Cybertary pursuant to Section 6(b)(iii) . . . .
>
> As further evidence of cause, Cybertary believes that you have failed to perform certain crucial duties related to your responsibility as Cybertary's chief executive officer. Those failures constitute "habitual neglect" or "dereliction" of your duties pursuant to Section 6(b)(ii) . . . , as well as "material misconduct" pursuant to Section 6(b)(iii).

The notice also stated that the grounds articulated as cause for Beckman's termination were "not intended to be a comprehensive list" and that Cybertary "reserve[d] the right to articulate additional grounds for terminating [Beckman's] employment for cause."

¶8　Beckman subsequently amended her complaint, adding Franchise Foundry and Faulconer as defendants. Beckman's amended breach of contract claim stated,

> In retaliation for filing this lawsuit, Faulconer and Franchise Foundry have attempted on behalf of Cybertary to terminate Beckman as Chief Executive Officer for Cybertary. Faulconer and Franchise Foundry have interfered with Beckman's ability to perform her duties as Chief Executive Officer . . . . Such retaliation and actions on behalf of Cybertary

further constitute a material breach of the Employment Agreement.

Beckman also added a claim for declaratory judgment, seeking to nullify Cybertary's termination of the Employment Agreement. In her prayer for relief, Beckman indicated that at trial she would prove damages believed to be "in excess of $300,000, plus interest, attorney's fees and costs."

¶9 Cybertary filed counterclaims against Beckman for, among other things, breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty. Cybertary alleged that Beckman had disparaged it, failed to keep its affairs confidential, and failed to perform her duties "in an effective and careful manner." Cybertary also asserted that it had "sustained significant damages" and, without specifying an amount, sought "general, specific, and consequential damages, in an amount to be proven at trial."

¶10 In March 2013, Beckman sought leave to amend her complaint for a second time. Beckman sought to amend her factual allegations, expand her claim for unjust enrichment, and add four new causes of action: breach of the operating agreement; breach of fiduciary duty; fraudulent inducement; and civil conspiracy. The trial court denied the motion, finding that it "was untimely and the product of unreasonable delay," and that Defendants would be prejudiced if the amendment were allowed.

¶11 Beckman and Defendants subsequently filed cross-motions for summary judgment. The trial court denied Beckman's motion but granted Defendants' motion in part. Specifically, it granted summary judgment to Franchise Foundry and Faulconer on Beckman's claim for breach of the Employment Agreement. The court explained that it was undisputed that "neither Franchise Foundry nor Faulconer are parties to [the] Employment Agreement" and reasoned that Beckman could not "enforce that contract against individuals or

entities that are not parties to the contract." The court otherwise denied Defendants' motion.

¶12 In advance of trial, Defendants filed a motion in limine, requesting that the trial court exclude the recording of the October conversation. Defendants argued that the recording constituted evidence of settlement negotiations and that it therefore should be excluded at trial pursuant to rule 408 of the Utah Rules of Evidence. The court agreed and granted Defendants' motion, ruling that "the statements captured therein constitute[d] compromise negotiations."

¶13 The case proceeded to trial. Although Cybertary had provided a supplemental disclosure quantifying its claimed damages as $373,500, the trial court found that the disclosure was untimely and refused to submit the question of Cybertary's damages to the jury. The court subsequently granted Beckman's motion for a directed verdict on Cybertary's counterclaims.

¶14 Before submitting the case to the jury, the parties disagreed about the jury instruction defining "cause" as it related to Cybertary's termination of Beckman's employment (Instruction 12). Beckman asserted that Instruction 12 should be worded to define "cause" as the seven events enumerated in the Employment Agreement, and she argued that Cybertary was required to prove at least one event "by a preponderance of the evidence." Defendants, on the other hand, asserted that Instruction 12 should explain that the determination of whether one of the events constituted "cause" "was a matter for Cybertary's good business judgment." Defendants further proposed that Instruction 12 provide that "[s]o long as Cybertary possessed a fair and honest cause or reason, in good faith, that met one of these [seven enumerated] definitions, cause existed to terminate Beckman, whether or not the facts that Cybertary believed to be true really, in fact, were true." (Citing *Uintah Basin Med. Center v. Hardy*, 2005 UT App 92, ¶ 16, 110 P.3d 168.)

¶15 The version of Instruction 12 given to the jury included Beckman's language about Cybertary having to prove at least

one of the seven enumerated events by a preponderance of the evidence, while also including Defendants' language providing that whether "cause" existed "was a matter for Cybertary's good business judgment."

¶16 The jury found in favor of Beckman, in part. On the special verdict form, the jury indicated that Cybertary breached the Employment Agreement by failing to pay Beckman's compensation and benefits, but did not breach the agreement by terminating her employment without cause. The jury further found that neither Franchise Foundry nor Faulconer acted with gross negligence or willful misconduct. Although Beckman sought an award of $235,041.05, the jury determined that Cybertary owed Beckman $84,913.83 in unpaid salary and $18,150 in unpaid benefits, totaling $103,063.83 in damages.

¶17 Beckman then moved for an award of prejudgment interest. The trial court denied the motion, concluding that Beckman's damages "are not the type of damages that are susceptible to an award of prejudgment interest."

¶18 Beckman and Cybertary also filed competing motions for attorney fees. Both relied on the attorney fees provision contained in the Employment Agreement. Under that provision, the "nonprevailing party" "to any proceeding under [the Employment Agreement]" pays its own and the other side's reasonable expenses, including attorney fees. The provision defined "nonprevailing party" as "the party that the court of competent jurisdiction awards less than one-half (1/2) of all of the amounts in dispute."

¶19 The court construed the attorney fees provision "as mandating an assessment of whether each party asserting a claim under the Employment Agreement is a 'nonprevailing party' under that claim." As to Beckman's fees request, the court determined that "[b]ecause Cybertary was awarded less than one-half of the amounts it sought against Beckman, it [was] the nonprevailing party with respect to its counterclaims, and it [was] therefore required to pay Beckman's attorney fees and

costs incurred in defending against those claims." Accordingly, the court awarded Beckman $75,317.24 against Cybertary. As to Cybertary's request for fees, the court determined that Beckman was the nonprevailing party with respect to her claims, "having recovered less than one half of the amount she sought against Cybertary." Thus, the court found, Beckman was required to pay the attorney fees and costs Cybertary incurred in defending against her claims, which amounted to $62,181.90. The court then subtracted the amount awarded to Cybertary from the amount awarded to Beckman, resulting in a net award of attorney fees and costs of $13,135.34 to Beckman.

¶20 Franchise Foundry and Faulconer also requested attorney fees. The trial court determined that because Franchise Foundry and Faulconer prevailed on summary judgment on Beckman's claim against them under the Employment Agreement, they were entitled to $27,153.33 in attorney fees from Beckman. Beckman appeals.

## ISSUES AND STANDARDS OF REVIEW

¶21 Beckman advances five main claims of error on appeal. First, Beckman contends that the trial court abused its discretion by denying her motion for leave to amend her complaint. This court "will not disturb a trial court's denial of a motion to amend pleadings absent an abuse of discretion." *Reller v. Argenziano*, 2015 UT App 241, ¶ 14, 360 P.3d 768. Under this standard, we will reverse the trial court if its decision "exceeds the limits of reasonability." *Coroles v. Sabey*, 2003 UT App 339, ¶ 16, 79 P.3d 974 (citation and internal quotation marks omitted).

¶22 Second, Beckman contends that the trial court incorrectly applied rule 408 of the Utah Rules of Evidence and exceeded its discretion in refusing to admit an audio recording of the October conversation on the ground that the recording was evidence of compromise negotiations. We review the trial court's resolution of the legal questions underlying the admissibility of evidence for correctness and the trial court's decision to admit or exclude

evidence for an abuse of discretion. *See State v. Griffin*, 2016 UT 33, ¶ 14, 384 P.3d 186.

¶23    Third, Beckman contends that Instruction 12 incorrectly defined "cause" with regard to the termination of her employment under the Employment Agreement. "A trial court's decision regarding jury instructions presents a question of law, which is reviewed for correctness." *Vitale v. Belmont Springs*, 916 P.2d 359, 361 (Utah Ct. App. 1996).

¶24    Fourth, Beckman contends that the trial court erroneously failed to award her prejudgment interest. "A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness." *Cornia v. Wilcox*, 898 P.2d 1379, 1387 (Utah 1995).

¶25    Fifth, Beckman contends that the trial court erred in its awards of attorney fees. "A challenge to an award of attorney fees [based on a] contract or statute . . . presents a question of law that we review for correctness." *Brodkin v. Tuhaye Golf, LLC*, 2015 UT App 165, ¶ 34, 355 P.3d 224.

ANALYSIS

I. Leave to Amend

¶26    First, Beckman contends that the trial court abused its discretion by denying her motion for leave to file a second amended complaint to add four new claims. Beckman argues that she should have been allowed to amend her complaint because her motion was not untimely, her delay was justified by her pending bankruptcy action, and Defendants would have had adequate time to prepare to defend against the new claims.

¶27    Rule 15 of the Utah Rules of Civil Procedure allows a party, before trial, to amend its pleading "once as a matter of course" within twenty-one days after serving the pleading, or, where a responsive pleading is required, the earlier of twenty-

one days after service of that pleading or twenty-one days after service of a motion under rule 12(b), (e), or (f).[2] Utah R. Civ. P. 15(a)(1). Additional amendments may be filed "only with the court's permission or the opposing party's written consent." *Id.* R. 15(a)(2). "The court should freely give permission when justice requires." *Id.*

¶28　Our supreme court has recently explained that this standard requires a district court "to decide whether the nonmoving party has identified a ground or factor sufficient to defeat the presumption in favor of amendment." *Stichting Mayflower Mountain Fonds v. United Park City Mines Co.*, 2017 UT 42, ¶ 48. Among the factors that may weigh against a decision to allow an amendment are untimeliness, undue delay, prejudice to the opposing party, bad faith, and failure to cure pleading deficiencies with other, earlier amendments; but, "[t]here is no rigid test." *Id.* ¶¶ 47–48; *see also Daniels v. Gamma West Brachytherapy, LLC*, 2009 UT 66, ¶ 58, 221 P.3d 256. "Even a single consideration or factor may be enough to justify denial of a motion for leave to amend." *Stichting Mayflower*, 2017 UT 42, ¶ 48.

¶29　In reviewing a district court's decision to deny a motion for leave to amend under rule 15(a), we owe the court deference because rule 15(a) "leaves a lot of discretion in the hands of the district judge." *Id.* ¶ 52. We afford that discretion because we recognize that district courts "are in a much better position than appellate courts to make such case-specific determinations as whether too much time has passed to fairly allow an amendment, whether a party's delay is the result of an unfair tactic or dilatory motive, or whether some other unforeseen factor militates for or against a particular result in that particular case." *Kelly v. Hard Money Funding, Inc.*, 2004 UT App 44, ¶ 41, 87

---

2. Rule 15 was amended in 2016. Although the trial court applied an earlier version of the rule, we cite the current version because recent amendments do not affect our analysis.

P.3d 734. Thus, "[t]he question presented is not whether we would have granted leave to amend. It is whether we find an abuse of discretion in the district judge's decision to deny the motion." *Stichting Mayflower*, 2017 UT 42, ¶ 49.

¶30    Under this standard, we affirm. The trial court here based its denial of Beckman's motion to amend on findings of untimeliness, unreasonable delay, and prejudice to Defendants. Beckman challenges all three of those findings but has not demonstrated that the trial court exceeded the bounds of its discretion in denying her motion on those grounds.

¶31    First, with respect to timeliness, Beckman argues that her motion, filed more than sixteen months after she filed her original complaint, was not untimely "as a matter of law." We do not disagree. There is, after all, no "bright line rule" against which to judge the timeliness of a motion to amend. *See Kelly*, 2004 UT App 44, ¶ 28. However, we are not persuaded that it was unreasonable for the trial court to conclude that Beckman's motion was untimely under the circumstances.

¶32    Beckman filed her motion months after the discovery deadline had passed[3] and after her lawsuit had been dormant for

---

3. During the hearing on her motion for leave to amend, Beckman identified August 15, 2012, as the fact discovery deadline and conceded that under rule 26 of the Utah Rules of Civil Procedure, "fact discovery has long since closed." In fact, rather than argue that the discovery deadline had not passed (or had only recently passed), Beckman focused on the reasons the case had been delayed, and advocated for a "new scheduling order" and "additional time for discovery." On appeal, Beckman's argument in her opening brief is similar to the one she made to the trial court. Although she argues that the "fact discovery cutoff date was September 6, 2012," she does not argue that the litigation was not in an advanced procedural stage; rather, she argues that "the time period at issue must

(continued…)

some time, causing the trial court judge to observe that the case had been "dragging on and dragging on and—and nothing done." Where Beckman sought to significantly expand the scope of the lawsuit by adding four new claims (including claims for fraud and conspiracy) more than sixteen months into litigation that had shown little outward progress, and months after deadlines established by rule 26 of the Utah Rules of Civil Procedure had passed, we cannot conclude that there was no reasonable basis for the court's timeliness finding.

¶33 Second, and closely related to her untimeliness argument, Beckman contends that she was justified in waiting to file her amended complaint because of uncertainties associated by her then-pending bankruptcy case. She argues that "moving forward with new and plausible claims for relief would have increased the likelihood that the trustee would have seized those claims," and thus she was justified in waiting until after the bankruptcy case concluded. In evaluating a movant's justification for delay, district courts "focus[] on the reasons offered by the moving party for failing to include the new facts or allegations in the original complaint." *Carter v. Bourgoin Constr., Inc.*, 2015 UT App 198, ¶ 11, 357 P.3d 1 (alteration in original) (citation and internal quotation marks omitted). "In doing so, a court should look for a dilatory motive, a bad faith effort . . . , or unreasonable neglect."

---

(…continued)

factor in the delays precipitated by [Defendants]." It is not until her reply brief that Beckman takes the position that fact discovery did not expire until May 8, 2013, just weeks before the trial court heard argument on her motion. Even if Beckman's change of position between the filing of her opening and reply brief was excusable due to what appears to be her reliance on the wrong version of rule 26, Beckman has offered no justification for her suggestion that we should review the trial court's decision based on facts different from those she argued before that court. Thus, we will hold her to the representations she made there.

*Id.* (omission in original) (citation and internal quotation marks omitted).

¶34 In this case, Beckman never demonstrated to the trial court why she had to wait to file certain claims despite having already filed other of her claims while the bankruptcy case was pending. In other words, she never explained why her expressed concern over what actions the trustee could take did not deter her from filing the claims pleaded in her original and first amended complaints, but did deter her from filing the additional claims she proposed to assert in her motion for leave to amend. Given the unanswered questions and inherent inconsistencies in Beckman's argument, we cannot conclude that the trial court exceeded its broad discretion in finding that Beckman's delay was unreasonable under the circumstances. *See Stichting Mayflower Mountain Fonds v. United Park City Mines Co.*, 2017 UT 42, ¶ 52 ("The judge is charged with deciding whether the movant had a good reason for not asserting the new claims at an earlier stage of the proceedings . . . [a]nd the judge's findings are entitled to deference on appeal. We are in no position to disturb them.").

¶35 Third, as to prejudice, Beckman argues that had she been permitted to amend her complaint, Defendants still would have had "ample time to adjudicate the issues raised in [her] second amended complaint."

¶36 In its oral ruling, the trial court determined that Beckman's delay in bringing her new claims caused "problems with Rule 26," and Defendants "would be prejudiced if Beckman were permitted to file her proposed Second Amended Complaint." The court observed that while discovery could be extended, the purpose behind rule 26 is "to make sure things are filed timely" and that that purpose was not served by extending the litigation to accommodate Beckman's proposed amendment.

¶37 While we acknowledge that the court could have reopened discovery and extended deadlines to accommodate Beckman's amendment, we are again mindful that the trial court

is better positioned than we are to assess the potential prejudice of an amended pleading on non-moving parties. *See Daniels v. Gamma West Brachytherapy, LLC*, 2009 UT 66, ¶ 60, 221 P.3d 256; *see also Stichting Mayflower*, 2017 UT 42, ¶ 52 ("Under the applicable standard of review, we owe deference to the district court's determination that [the moving party's] delay and the impact on the timely resolution of the case were sufficient to defeat the presumption in favor of amendment."). Given the trial court's "involvement in and experience with the case," *Stichting Mayflower*, 2017 UT 42, ¶ 53, it was in a better position than this court to assess the impact on Defendants of Beckman's proposed amendment by which she sought to add, after the close of discovery, four substantive claims to a case that had already extended beyond the timelines established under rule 26. Thus, there is a basis for the trial court's finding, and we conclude that the trial court did not exceed its broad discretion in denying leave to amend.

## II. The Exclusion of the October Conversation

¶38    Beckman next contends that the trial court erred in excluding, pursuant to rule 408 of the Utah Rules of Evidence, the audio recording of the October conversation. She argues that the recording does not fall within the scope of rule 408 because (1) no dispute existed at the time of the call, (2) the call constituted a business communication, and (3) Faulconer did not offer during the call to settle any disputed claim. Alternatively, Beckman argues that the recording should nevertheless be admitted because the recording contains statements relevant to the parties' claims and defenses and would be "otherwise discoverable."

¶39    Rule 408 provides that evidence of compromise offers and negotiations "is not admissible either to prove or disprove liability for or the validity or amount of a disputed claim." Utah R. Evid. 408(a). Specifically, when offered for that purpose, the rule bars evidence of "(1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable

consideration in order to compromise or attempt to compromise the claim; and (2) conduct or a statement made in compromise negotiations." *Id.* "[F]or the exclusionary rule to attach, the party seeking to have evidence of offers to compromise or statements made in the course thereof excluded must show that the discussions in question were made in compromise negotiations." *Davidson v. Prince*, 813 P.2d 1225, 1232 (Utah Ct. App. 1991) (citation and internal quotation marks omitted). The rule is "'premised on the idea that encouraging settlement of civil claims justifies excluding otherwise probative evidence from civil lawsuits.'" *State v. Mead*, 2001 UT 58, ¶ 46, 27 P.3d 1115 (quoting *Manko v. United States*, 87 F.3d 50, 54 (2d Cir. 1996)).

¶40   Rule 408 has two caveats. First, evidence subject to the rule may nevertheless be admitted if offered "for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Utah R. Evid. 408(b)(1). Second, "otherwise discoverable" evidence need not be excluded "merely because it is presented in the course of compromise negotiations." *Id.* R. 408(b)(2). In other words, rule 408 "does not immunize the information included in fact statements, but, in order to encourage free discussion, merely makes inadmissible the statements themselves when offered as admissions of a party opponent." Edward L. Kimball & Ronald N. Boyce, *Utah Evidence Law* 4-130 (2d ed. 2004).

¶41   We agree with the trial court that the recording of the October conversation is evidence of "conduct [and] statement[s] made in compromise negotiations." *See* Utah R. Evid. 408(a)(2). Both Beckman and Faulconer engaged in the October conversation with the understanding that the purpose of the colloquy was to discuss a resolution of their dispute. Faulconer suggested the parties speak after Beckman had threatened litigation, and in his email arranging the phone call, Faulconer twice stated that if Beckman agreed to participate, the discussion would be "for settlement purposes only." Faulconer further reiterated the point at the beginning of the call, and he stated

that he would be frank to aid in their effort to "reach a settlement" and "to make this work."

¶42   For her part, Beckman demonstrated her assent to Faulconer's condition by proceeding with the conversation, stating that her attorney had given them the "green light" to have the discussion. She also twice acknowledged that the stated purpose of the call was "for settlement . . . only," and for ninety minutes she discussed with Faulconer the grounds of their dispute and proposals to resolve it. The record therefore supports the trial court's conclusion that the ensuing "statements captured [in the recording] constitute[d] compromise negotiations," and the recording is inadmissible under rule 408 "either to prove or disprove liability for or the validity or amount of" Beckman's claims. *See id.*

¶43   Beckman nevertheless argues that because, at the time of the call, Faulconer had not disputed that Beckman's wages were owed to her and Cybertary had not terminated her employment, there were no disputes to compromise and the conversation was simply a "business communication." The record does not support Beckman's claim. Midway through the phone call, Beckman expressly confirmed the parties' dispute when she stated: "We are here to discuss the dispute related to the employment agreement." She also began the conversation by saying that she was recording it so that she could share it with her attorney. And, although the recording evidences Faulconer's agreement that Beckman had earned her wages, it also shows that the parties sharply disagreed over whether Beckman shared responsibility for the wages not being paid; whether Beckman, Faulconer, and Franchise Foundry could be held individually liable for the wages; and where funds would come from to pay the wages. Similarly, with regard to Beckman's employment, although she had not yet been terminated, the parties discussed their disagreement over whether Faulconer had cause and authority to terminate Beckman, and she sought, as a step toward resolution of their dispute, an assurance that Faulconer had no such intent. Thus, the recording itself amply

demonstrates that the parties had an ongoing dispute and that the phone call was not a business communication.

¶44 Beckman further argues that the trial court erred in excluding the recording under rule 408 because the recording does not constitute evidence of "furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—valuable consideration in order to compromise or attempt to compromise the claim" under rule 408(a)(1). Beckman's argument is misplaced. The court excluded the evidence under rule 408(a)(2), as "conduct or . . . statement[s] made in compromise negotiations." Because the court did not rely on subsection (a)(1) of rule 408 to find the recording inadmissible, we need not consider whether Faulconer's offers of compromise constitute "valuable consideration" under that subsection.

¶45 As for rule 408's caveats, Beckman does not claim that she offered the recording for a purpose other than to "prove or disprove liability for or the validity or amount of a disputed claim," *see* Utah R. Evid. 408(b)(1), but she suggests that unidentified statements in the recording are "otherwise discoverable" and therefore admissible, *see id.* R. 408(b)(2). Rule 408(b)(2) states that courts are "not required to exclude evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." *Id.* We agree with Defendants that rule 408(b)(2) does not apply because Beckman seeks to admit "a recording of the *actual* compromise negotiations to prove certain alleged admissions by Faulconer." (Emphasis omitted.) For the reasons stated above, the trial court did not err in concluding that evidence of those negotiations is inadmissible under rule 408(a)(2).

III. The Jury Instruction Regarding "Cause" for Termination

¶46 Beckman next contends that the trial court erred in instructing the jury as to the definition of "cause" in connection with her claim that Cybertary breached the Employment Agreement when it terminated her employment without cause.

Under the Employment Agreement, the parties agreed that Cybertary would employ Beckman for three years subject to earlier termination as provided in the "Termination for Cause" provision. It stated that Beckman's term of employment "may be terminated by [Cybertary] immediately for 'cause,'" and enumerated seven "events with respect to [Beckman]" that "shall constitute '[c]ause'" for immediate termination:

> (i) Executive's commission of a felony of any kind or any other crime (whether it is a felony or not) involving securities fraud, theft, or moral turpitude;

> (ii) Executive's willful breach, habitual neglect, gross neglect, or dereliction of Executive's duties under this Agreement;

> (iii) Executive's material misconduct with regard to the Company, including, but not limited to, Executive's failure to comply with [the] Company's written rules and policies;

> (iv) Executive's failure to follow in good faith the reasonable lawful direction of the Board or any committee thereof;

> (v) Any act by Executive of sexual harassment (or Executive's creating a hostile work environment) or any other activity of Executive prohibited by state, local, and/or federal law with respect to discrimination based on age, sex, race, religion, or national origin;

> (vi) Any conduct, whether dishonest, fraudulent, or otherwise, that discredits the Company or is detrimental to the reputation of the Company or the Company's results of operations or business; and/or

(vii) Any breach of any of Executive's obligations under the Inventions, Confidentiality, and Restrictive Covenant Agreement referred to below.

¶47 Instruction 12 identified these events[4] and specified, "'Cause' has been defined in . . . the Employment Agreement and requires Cybertary to prove, by a preponderance of the evidence," one of the events. Beckman's challenge focuses on additional language included in Instruction 12, which applies the business judgment rule to the determination of cause:

> In determining whether Cybertary breached the Employment Agreement by inaccurately determining that one or more of these definitions of "cause" existed, you must remember that the determination of whether one or more of these definitions was satisfied was a matter for Cybertary's good business judgment. So long as Cybertary possessed a fair and honest cause or reason, in good faith, that met one of these definitions, cause existed to terminate Beckman, whether or not the facts that Cybertary believed to be true really, in fact, were true.

Beckman asserts that by instructing the jury regarding Cybertary's good business judgment, the trial court incorrectly "looked beyond the plain language of [the] Employment Agreement and inserted its own definition of what constitutes 'cause' for termination." Cybertary responds that the Employment Agreement does not define "what the employer must prove to establish cause for termination" and that the jury was properly instructed as to Utah law in that regard. According to Cybertary, "[e]mployers are not required to prove the facts

---

4. We note for the sake of accuracy that Instruction 12 actually included event (vi) twice and omitted event (iv). Neither party has complained about that apparent error.

giving rise to the termination so long as the employer can demonstrate a reasonable, good-faith belief that the facts existed." Cybertary's argument and the trial court's decision to include the challenged language in Instruction 12 rested on their interpretation of *Uintah Basin Medical Center v. Hardy*, 2005 UT App 92, 110 P.3d 168.

¶48    The dispute in *Uintah Basin* centered on a two-page employment agreement that provided that the agreement could be terminated after ninety days' "written notice for just cause of termination by either party." *Id.* ¶ 2 (internal quotation marks omitted). The agreement did not define "'just cause' or otherwise clarify what grounds would justify termination." *Id.* This court concluded, in the absence of evidence that the parties intended a meaning of just cause unique to their agreement, that "the parties intended the term to have its ordinary meaning." *Id.* ¶ 17. The court explained that the term "just cause" is "ordinarily understood to provide employers with power to terminate an employee for legitimate business reasons and in the interest of improving client services as long as the justification is not a mere pretext for a capricious, bad faith, or illegal termination." *Id.*; *see also id.* ¶ 16 (explaining that "termination for just cause is widely understood to permit discharge only for 'a fair and honest cause or reason, regulated by good faith . . . as opposed to one that is trivial, capricious, unrelated to business needs or goals, or pretextual'" (omission in original) (quoting *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1100 (Cal. 2000))); *id.* ("What constitutes good cause for dismissal of an employee is generally a matter for an employer's good business judgment . . . ." (omission in original) (citation and internal quotation marks omitted)).

¶49    With respect to "what an employer must show to prove it terminated an employee for just cause," the court adopted an "objective reasonableness approach," *id.* ¶¶ 21, 23, under which employers may "justify termination with an objective good faith reason supported by facts reasonably believed to be true by the employer," *id.* ¶ 22. Courts applying this approach should recognize that "an employer's [proffered] justification for

discharging an employee should not be taken at face value but also recognize that a judge or jury should not be called upon to second-guess an employer's business decisions." *Id.* Thus, the employer in *Uintah Basin* could establish just cause for termination by showing that it "acted in good faith by adequately considering the facts it reasonably believed to be true at the time it made the decision."[5] *Id.* ¶ 23.

¶50 Beckman asserts that because the Employment Agreement "specifically defines what 'cause' for termination means," the objective reasonableness approach adopted in *Uintah Basin* does not apply. She argues that the Employment Agreement should be interpreted according to its plain language, and that the holding of *Uintah Basin* with respect to "just cause" cannot be invoked to modify the terms of her contract in which "cause" has been expressly defined. Cybertary disagrees, arguing that *Uintah Basin* "is not so readily restricted to its facts" and that the court's reasoning "is still pertinent." Cybertary contends that "[a]lthough the Employment Agreement enumerated general grounds for cause, rather than an undefined articulation of 'just cause,' the enumerated grounds are no more instructive and offer no more practical guidance." Thus, Cybertary argues, "*Uintah* teaches that such definitions, like 'just cause' generally, must be interpreted and applied, in the first instance, by the employer."

¶51 We agree with Beckman. "When interpreting a contract, our task is to ascertain the parties' intent." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994; *see also Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1044 (Utah 1989) ("[E]mployment contracts should be construed to give effect to

---

5. In adopting the objective reasonableness approach, the court acknowledged but rejected an approach requiring "the employer to prove that the conditions necessitating termination actually existed." *Uintah Basin Med. Center v. Hardy*, 2005 UT App 92, ¶¶ 21–23, 110 P.3d 168.

the intent of the parties."). "And the best indication of the parties' intent is the ordinary meaning of the contract's terms." *Mind & Motion*, 2016 UT 6, ¶ 24. "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *WebBank v. American Gen. Annuity Service Corp.*, 2002 UT 88, ¶ 19, 54 P.3d 1139 (citation and internal quotation marks omitted).

¶52    In *Uintah Basin*, the parties had agreed to an employment arrangement that could be terminated for "just cause." *Uintah Basin Med. Center v. Hardy*, 2005 UT App 92, ¶¶ 2, 10, 110 P.3d 168. Because the parties did not define the term, this court concluded that the parties intended it to have its ordinary meaning—a meaning that included a measure of discretion. *Id.* ¶¶ 2, 16–17. And having determined that the term "just cause" is "widely understood to permit discharge only for a fair and honest cause or reason, regulated by good faith," *id.* ¶ 16 (citation and internal quotation marks omitted), the court concluded that the fact-finder should determine whether the employer had an "objective good faith reason" for termination rather than second-guess the employer's business decision, *see id.* ¶¶ 22–23.

¶53    We cannot, however, reach the same conclusion in this case. Cybertary and Beckman negotiated an employment contract with seven enumerated events that constituted cause for early termination. Thus, unlike the parties in *Uintah Basin*, Cybertary and Beckman clearly evidenced their intent that something other than the ordinary meaning of just cause would govern Beckman's termination. For example, while "just cause" as defined in *Uintah Basin* permits termination on the basis of *any* "good faith business reason[]," *id.* ¶ 19, the Employment Agreement narrowed the scope of permissible bases for termination to those specifically identified. Because the parties did not create a contract in which termination would be permitted on the basis of any just cause, we do not incorporate

that term, or its accordant "objective reasonableness" standard, into the parties' contract.

¶54 A contrary interpretation—that Beckman could be terminated for the mistaken, but honest belief, that one of the seven enumerated events identified in the Employment Agreement had occurred—is unwarranted. The contract language "established a standard that is sufficiently definite to allow a fact-finder to determine whether [Cybertary] had [cause] to support the termination of [Beckman's] employment."[6] *See Kern v. Palmer College of Chiropractic*, 757 N.W.2d 651, 660 (Iowa 2008) (rejecting the objective reasonableness approach where the parties expressly defined the meaning of cause in their employment contract). Having contracted for that standard, we see no justification for Cybertary's assertion that the fact-finder should not be allowed to "second guess" Cybertary's own determination of whether cause existed to terminate Beckman's employment. *See id.*; *Janoff v. Gentle Dental, PC*, 986 P.2d 1278, 1280–81 (Or. Ct. App. 1999) (seeing "no reason to treat [an employment] contract differently from every other contract, including [a] plaintiff's right to a judicial determination of all factual issues related to whether" the enumerated grounds for termination were satisfied).

¶55 Given our conclusion that the Employment Agreement does not incorporate an objective reasonableness standard into the termination provision, it was erroneous for the trial court to instruct the jury that "the determination of whether one or more of these definitions [of cause] was satisfied was a matter for Cybertary's good business judgment." It was also erroneous to instruct the jury that "[s]o long as Cybertary possessed a fair and

---

6. In reaching this conclusion, we reject Cybertary's argument that the seven enumerated events identified in the Employment Agreement as cause for termination are so ill-defined that they "must be interpreted and applied, in the first instance, by the employer."

honest cause or reason, in good faith, that met one of these definitions, cause existed to terminate Beckman."

¶56   "An erroneous jury instruction is prejudicial if, taken in context with the jury instructions as a whole, it misadvised or misled the jury on the law." *Harris v. ShopKo Stores, Inc.*, 2013 UT 34, ¶ 39, 308 P.3d 449 (citations and internal quotation marks omitted). This court will reverse for a new trial when it is reasonably likely that the error affected the outcome and "our confidence in the jury's verdict is undermined." *Id.* ¶ 40 (citation and internal quotation marks omitted).

¶57   Here, we conclude that the error in Instruction 12 was prejudicial. As explained above, Instruction 12 misadvised the jury on the applicable law with respect to Beckman's claim that Cybertary breached the Employment Agreement by terminating her employment without cause. Based on this incorrect legal standard, the jury may well have determined that Cybertary legally terminated Beckman's employment based only on a good faith belief that cause existed even if there was no actual cause for termination. Thus, there is a reasonable likelihood that the jury may have reached a different result had it been given jury instructions that articulated the correct legal standard. We therefore reverse and remand for a new trial on this claim.

## IV. Prejudgment Interest

¶58   Beckman contends that the trial court erred in declining to award her prejudgment interest. She asserts that she is entitled to prejudgment interest because her unpaid wages and benefits can be measured and quantified by the amounts specified in the Employment Agreement and because her damages were fixed and complete as of the date of her termination on November 14, 2011. Cybertary responds that Beckman's loss was not fixed as of a particular time, because the jury had to "exercise its judgment and discretion to award damages" in limiting the damages award to the wages and benefits that had accrued prior to Beckman's termination, in determining whether that award was subject to an offset, and in determining whether Beckman had

waived or deferred her right to payment. Cybertary also argues that because any interest would accrue from the date of each missed payment, and because Beckman was sometimes overpaid, Beckman did not provide sufficient evidence to support an award of prejudgment interest. Cybertary further argues that prejudgment interest is unavailable because the Employment Agreement was not a contract for the loan or forbearance of money, goods, or chose in action.

¶59 "[T]he purpose of awarding prejudgment interest is to compensate a party for the depreciating value of the amount owed over time and, as a corollary, to deter parties from intentionally withholding an amount that is liquidated and owing." *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 67, 210 P.3d 263 (citation and internal quotation marks omitted). Under Utah law, "[p]rejudgment interest may be recovered where the damage is complete, the amount of the loss is fixed as of a particular time, and the loss is measurable by facts and figures." *Id.* ¶ 51 (citation and internal quotation marks omitted). "[L]osses that cannot be calculated with mathematical accuracy are those in which damage amounts are to be determined by the broad discretion of the trier of fact, requiring the fact-finder to be guided by [its] best judgment in assessing the amount to be allowed for past as well as for future injury." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 100, 372 P.3d 629 (first alteration in original) (citations and internal quotation marks omitted). "Such losses include those stemming from personal injury, wrongful death, defamation, false imprisonment, malicious prosecution, and assault and battery." *Id.* In those situations, prejudgment interest is inappropriate because "the trier of fact is left to assess damages based on a mere description of the wrongs done or injuries inflicted." *Encon Utah*, 2009 UT 7, ¶ 53 (citation and internal quotation marks omitted).

¶60 Here, we agree with Beckman that her damages could be calculated with mathematical accuracy. For Beckman's only successful claim, she alleged that Cybertary had not paid wages

and benefits she was due under the terms of the Employment Agreement. The Employment Agreement established the payment schedule and the amounts due to Beckman, and at trial Beckman provided an exhibit breaking down the funds that Cybertary paid. And even Cybertary conceded in the trial court that the jury calculated its damages award by subtracting the amount Cybertary paid Beckman over the course of her employment from the total amount she was due.[7] Unlike "cases where the trier of fact is left to assess damages based on a mere description of the wrongs done or injuries inflicted," *see id.* (citation and internal quotation marks omitted), the amount owed under the Employment Agreement was "ascertainable by calculation," *see id.* ¶ 54 (citation and internal quotation marks omitted). Accordingly, we conclude that Beckman was entitled to prejudgment interest. *See id.* ¶ 65 (stating that the trial court based its decision on measurable facts and figures because it reviewed the terms of the fixed price contract, the percentage of work completed, and noted that the parties agreed to a 10% profit on that work); *Campbell, Maack & Sessions v. Debry*, 2001 UT App 397, ¶ 23, 38 P.3d 984 (affirming an award of prejudgment interest where a debt existed under an agreement, the debtor delayed in tendering the amount due, and the court had "sufficient information to calculate the loss with mathematical accuracy and to fix the loss as of a particular time" (brackets, citation, and internal quotation marks omitted)).

---

7. In opposition to Beckman's motion for prejudgment interest, Cybertary observed that the jury's verdict "plainly tracked" Beckman's Trial Exhibit 34, which totaled the payroll payments Cybertary made to Beckman throughout her employment, in the amount of $45,961.17. Section 3(a) of the Employment Agreement identified, by month, the salary due to Beckman from June 2010 through her termination, which totaled $130,875. Subtracting the amount Cybertary paid Beckman from the amount it owed totaled $84,913.83—the amount the jury awarded for unpaid salary.

¶61    Cybertary counters that because the jury had to determine Beckman's damages and because it ultimately awarded a lesser amount than she claimed, her loss was not fixed as of a particular time. The fact that Beckman's damages were ascertained at trial, however, does not mean that her damages were "not already complete, fixed, and measurable." *See Highlands at Jordanelle, LLC v. Wasatch County*, 2015 UT App 173, ¶ 28, 355 P.3d 1047; *see also AE, Inc. v. Goodyear Tire & Rubber Co.*, 576 F.3d 1050, 1058 (10th Cir. 2009) (concluding that, under Utah law, it "is clear that prejudgment interest may be appropriate even if the amount of damages [is] ascertained at trial"). Beckman asserted two breach of contract theories against Cybertary: one based on Cybertary's failure to pay wages and benefits Beckman earned for the time period before her termination, and another based on Cybertary's premature termination of the Employment Agreement. As damages for that second theory, Beckman sought the wages and benefits she would have earned had Cybertary not prematurely terminated her employment. Ultimately, the jury awarded Beckman only those wages and benefits she earned pre-termination because it rejected her theory that Cybertary unlawfully terminated her employment without cause. But the fact that the jury rejected Beckman's second theory, and its attendant claim for post-termination wages and benefits, does not negate the fact that Beckman's damages for unpaid wages for the period prior to her termination were fixed and measurable based on the amount she was owed under the Employment Agreement. *See Encon Utah*, 2009 UT 7, ¶ 54 (noting that prejudgment interest is appropriate in cases where the amount due under the contract is "ascertainable by calculation" (citation and internal quotation marks omitted)).

¶62    Relatedly, Cybertary argues that Beckman should be denied prejudgment interest because the "claimed prejudgment interest is not 'calculable with mathematical certainty.'" Beckman calculated interest from the date Cybertary terminated her employment (November 14, 2011) rather than from the earlier dates of each alleged breach. Cybertary argues that

because Beckman did not calculate the prejudgment interest from the date of each missed payment, the court did not have sufficient evidence before it to correctly calculate the interest. Cybertary's argument misses the mark. "The mathematical accuracy standard does not apply to the calculation of prejudgment interest itself, but instead applies to the amount of damages found by the trier of fact." *Iron Head Constr., Inc. v. Gurney*, 2009 UT 25, ¶ 18, 207 P.3d 1231.

¶63 Moreover, Cybertary does not contend that Beckman's requested prejudgment interest is not readily calculable. Rather, Cybertary complains that Beckman failed to provide sufficient evidence for the court to award prejudgment interest accruing incrementally from the date of each missed payment. But Beckman did not seek to recover that added interest. Beckman sought only to recover interest that accrued as of the date of her termination. Any argument that Beckman may have lacked sufficient evidence to recover prejudgment interest that accrued *before* her termination does not render her evidence insufficient as to the post-termination interest she actually sought.

¶64 Cybertary, citing Utah Code section 15-1-1, further argues that prejudgment interest is unavailable to Beckman because the Employment Agreement was not a contract for "the loan or forbearance of any money, goods, or chose in action." Section 15-1-1 states, "Unless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum." Utah Code Ann. § 15-1-1(2) (LexisNexis 2013). Contrary to Cybertary's argument, this provision does not dictate whether a party is entitled to prejudgment interest. That determination is made based on whether a party's damages can be calculated with mathematical accuracy. *See supra* ¶ 59. Instead, section 15-1-1 identifies the particular interest rate that applies to those categories of contracts identified in the statute. *See USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 109, 372 P.3d 629. Hence, Cybertary cannot rely on section 15-1-1 to defeat Beckman's claim to prejudgment interest.

¶65   We reverse the trial court's order denying Beckman prejudgment interest and remand for the trial court to calculate the amount of prejudgment interest to which Beckman is entitled.

## V. Attorney Fees

¶66   Beckman challenges the trial court's awards of attorney fees in two respects. First, she contends that the trial court erred by awarding attorney fees to Cybertary. Second, she contends that the trial court erred by awarding attorney fees to Franchise Foundry and Faulconer. Finally, all of the parties request attorney fees on appeal. We address each category of attorney fees in turn.

### A.   The Attorney Fees Awarded to Cybertary[8]

¶67   "In Utah, attorney fees are awardable only if authorized by statute or by contract." *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988). If provided for by contract, the award of attorney fees is allowed "only in accordance with the explicit terms of the contract and only to the extent permitted by the contract." *Maynard v. Wharton*, 912 P.2d 446, 451 (Utah Ct. App. 1996).

¶68   The trial court awarded attorney fees based on its interpretation of the attorney fees provision in the Employment Agreement. That provision states,

---

8. Although we are remanding this matter for a new trial on Beckman's termination claim against Cybertary, we address this issue because it has been fully briefed and is likely to arise again on remand. *See State v. James*, 819 P.2d 781, 795 (Utah 1991); *see also* Utah R. App. P. 30(a) ("If a new trial is granted, the court may pass upon and determine all questions of law involved in the case presented upon the appeal and necessary to the final determination of the case.").

> The nonprevailing party in any proceeding hereunder shall be the party that the court of competent jurisdiction awards less than one-half (1/2) of all of the amounts in dispute ("Nonprevailing Party"). The Nonprevailing Party to any proceeding under this Agreement shall pay its own expenses, the court fees, and any administrative fees arising in connection therewith, and the expenses, including without limitation, attorneys' fees, costs, and costs of investigation, reasonably incurred by the other party to the proceeding.

Under this provision, the "nonprevailing party" is responsible for paying its own and the other party's reasonable attorney fees and other expenses. The "nonprevailing party" is defined as the party who was "award[ed] less than one-half (1/2) of all of the amounts in dispute."

¶69 The Employment Agreement does not explain how to calculate "all of the amounts in dispute." The parties disagreed over the relevant figures before the trial court, but for purposes of this appeal, Beckman and Cybertary apparently agree on the following pertinent facts and figures: Beckman sought an award of $235,041.05 at trial for breach of the Employment Agreement, and the jury awarded her $103,063.83; Cybertary disclosed damages in the amount of $373,500 for its counterclaims, but the trial court excluded Cybertary's damages from trial for failure to timely disclose them; and the court granted a directed verdict on the counterclaims to Beckman.

¶70 The trial court construed the attorney fees provision's language "as mandating an assessment of whether each party asserting a claim under the Employment Agreement is a 'nonprevailing party' under that claim." Consequently, the court in effect bifurcated its analysis. The court first assessed whether Cybertary recovered less than half of the amounts it sought against Beckman on its counterclaims and, second, the court

assessed whether Beckman recovered less than half of the amounts she sought against Cybertary on all of her claims. Taking this approach, the court determined that Cybertary was the nonprevailing party under its counterclaims and that Beckman was the nonprevailing party under her claims against Cybertary. Because both sides were "nonprevailing parties" under this analysis, the trial court concluded that each side owed the other for the attorney fees incurred in defending against the respective claims. And because Beckman's attorney fees award exceeded that of Cybertary, the court offset those amounts and awarded Beckman a total of $13,135.34.

¶71    On appeal, Beckman challenges the trial court's decision to apply the attorney fees provision by evaluating whether each party asserting a claim under the Employment Agreement was a "nonprevailing party" with respect to that claim. She asserts that this approach contradicts the plain language of the Employment Agreement. By her reading, the attorney fees provision allows for "only one prevailing party" because the "term 'nonprevailing party' is singular," and "'all of the amounts'" is a plural phrase that refers to "those amounts sought in the 'dispute,'" a singular term. Beckman argues that the attorney fees provision "groups 'all amounts in dispute' together and then assigns liability to the one party who is awarded less than one-half of those amounts." (Emphasis omitted.)

¶72    According to Beckman, she sought an award of $235,041.05 at trial, and Cybertary, despite having its supplemental disclosure of damages struck at trial, sought damages of $373,500 on its counterclaims. By Beckman's math, to determine "all of the amounts in dispute," the trial court "should have *subtracted* what Beckman sought ($235,041.05) from what Cybertary sought ($373,500) to arrive at $138,458.95." (Emphasis added.) Because Cybertary was awarded nothing at trial, Beckman argues, Cybertary recovered less than half of the amounts in dispute and therefore was the "nonprevailing party" as defined by the attorney fees provision.

¶73　Cybertary offers a different interpretation of the provision and a different calculation of "all of the amounts in dispute." Cybertary asserts that the "only way to read [the attorney fees provision] with any fidelity to its language, and with any common sense, is to recognize that it assesses attorney fees for each party asserting a claim." This reading separates each party's total claimed damages and compares those amounts with each party's ultimate recovery. According to Cybertary, when Beckman recovered $103,063.83 at trial, she recovered "less than half of the total $235,041.05 she sought in damages." On her claims, Cybertary states that Beckman "is therefore the nonprevailing party and required to pay Cybertary's attorney fees and costs associated with" those claims. Likewise, because Cybertary "recovered less than half of its $373,500.00 claim," Cybertary admits it "is the nonprevailing party on its claims and must therefore pay Beckman's attorney fees associated with that claim."

¶74　To illustrate why its interpretation of the attorney fees provision makes sense, Cybertary posits an alternative scenario in which "all of the amounts in dispute" are determined by adding the parties' claimed damages together. Cybertary asserts that this scenario would adhere to a strict reading of the provision and result in $608,541.45 as the total of Beckman's and Cybertary's claims. But even if Beckman recovered her entire amount claimed in damages, she would be deemed the nonprevailing party who is liable for Cybertary's attorney fees. As Cybertary explains, this reading would lead to "a harsh, absurd result" because "a defendant could resist a legitimate claim by asserting a bogus counterclaim in an astronomical amount, and then claim that the prevailing plaintiff is not entitled to attorney fees, even though the plaintiff recovered 100% of its claim." In other words, Cybertary claims that adding each side's claimed damages together to determine "all of the amounts in dispute" would give a defendant a perverse incentive to plead meritless counterclaims in high amounts.

¶75    To resolve this issue, we must look to the four corners of the Employment Agreement to determine its meaning and the parties' intentions. *Nolin v. S & S Constr., Inc.*, 2013 UT App 94, ¶ 12, 301 P.3d 1026. If the language within the four corners of the contract is unambiguous, we may determine the parties' intentions from the plain meaning of the contractual language as a matter of law. *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 16, 52 P.3d 1179. A "court considers extrinsic evidence of the parties' intent only if the language of the contract is ambiguous." *Glenn v. Reese*, 2009 UT 80, ¶ 10, 225 P.3d 185. A contractual provision may be ambiguous if it is "unclear, it omits terms, or the terms used to express the intention of the parties may be understood to have two or more plausible meanings." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 15, 133 P.3d 428 (citation and internal quotation marks omitted).

¶76    Both parties contend that the Employment Agreement is unambiguous and must be read in support of their respective positions. Applying the above principles, we examine this rather unusual attorney fees clause. The Employment Agreement requires that the "nonprevailing party" pay its own expenses and court fees along with the fees and costs reasonably incurred by the other party "in any proceeding" thereunder. The agreement specifically defines the nonprevailing party as "the party that the court of competent jurisdiction awards less than one-half (1/2) of all of the amounts in dispute." By defining the nonprevailing party this way, this attorney fees provision differs considerably from the more standard, boilerplate provisions that entitle the prevailing party to an award of attorney fees.[9]

---

9. Beckman cites common law principles, including the net judgment rule and comparative victory rule, to support her interpretation of the attorney fees provision. These common law rules might have some relevance if the contractual provision at issue stated that the prevailing party is liable for attorney fees. *See Olsen v. Lund*, 2010 UT App 353, ¶¶ 4, 7–8, 246 P.3d 521. But

(continued…)

¶77    Contrary to Cybertary's argument and the conclusion of the trial court, we see no indication in the Employment Agreement that the parties intended to apply the attorney fees provision in a bifurcated fashion. The provision not only refers to the "nonprevailing party" in the singular, but it refers to that singular nonprevailing party "in any proceeding hereunder." The term "proceeding" is commonly understood to mean a "legal action," Merriam-Webster.com, http://www.merriam-webster.com/dictionary/proceeding (last visited Mar. 21, 2018), suggesting that in a singular legal action under the Employment Agreement there will be only one nonprevailing party. And that nonprevailing party is to pay all of its own fees and costs and those of the other party "arising in connection therewith."

¶78    In other words, the potential obligation to pay attorney fees and costs is expressly tied to fees incurred in connection with the proceeding; it is neither completely untethered nor tied to fees and costs incurred relative to a particular claim. By expressly tethering the definition of "nonprevailing party" to a proceeding, we cannot fairly read the term as tethered to a party's claims.

¶79    The agreement defines the nonprevailing party as the party in the proceeding to whom the court "awards less than one-half (1/2) of all of the amounts in dispute." Beckman and Cybertary suggest two alternative ways to determine "all of the

_____

(…continued)

because the award of attorney fees under the Employment Agreement depends on which party is deemed the "nonprevailing party," our analysis does not utilize these common law principles. *See Foote v. Clark*, 962 P.2d 52, 54–55 (Utah 1998) (concluding that cases evaluating the parties' respective successes to determine which was the prevailing party were irrelevant where the only criterion for an award of attorney fees under the contract was to demonstrate that the other party was in default).

amounts in dispute" when counterclaims are involved: by subtracting, or offsetting, the parties' damages (the subtraction approach); or by adding both parties' damages together (the addition approach).

¶80    Under the subtraction approach, "all of the amounts in dispute" would be calculated by offsetting the plaintiff's and the defendant's claimed damages. In other words, the actual amount in dispute would be determined by subtracting one party's claimed damages from the other party's. The actual amount of money in dispute would thus turn on the relative damages each party claimed. If one party claimed a large amount of damages and another claimed a smaller amount, it is possible that the party claiming the smaller amount could recover all of the damages it seeks and still be deemed a "nonprevailing party" if its recovery was less than one-half of the difference.[10]

¶81    Under the addition approach, "all of the amounts in dispute" would be determined by adding the parties' damages together. Like the subtraction approach, the addition approach would make the total amount in dispute hinge on how much each party claimed in damages. And hypothetically, even if one party recovered entirely on its claim, that party could be deemed the nonprevailing party if the other party asserted a greater amount of damages.[11]

---

10. For example, if the plaintiff asserted a claim for $100,000 and the defendant counterclaimed for $600,000, "all of the amounts in dispute" under Beckman's subtraction approach would be $500,000. The plaintiff could recover the entirety of its damages and still be deemed a "nonprevailing party" for recovering less than half of the "all of the amounts in dispute."

11. For example, if the plaintiff asserted a claim for $100,000 and the defendant counterclaimed for $600,000, "all of the amounts in dispute" under the addition approach would be $700,000.

(continued…)

¶82 Although both approaches make the risk of paying attorney fees dependent upon the amount of damages claimed by the other party, and both have the potential to lead to arbitrary results, Beckman advocates for the subtraction approach presumably because it works in her favor in this case. Had the trial court subtracted Beckman's claimed damages from Cybertary's claimed damages, it would have determined that $138,458.95 constituted "all of the amounts in dispute." And because Cybertary recovered nothing and Beckman recovered $103,063.83, more than half of the total amount, Beckman contends that Cybertary should be deemed the singular nonprevailing party. Cybertary, on the other hand, contends that neither approach should apply, reasoning that the subtraction approach is not supported by the provision's plain language while the addition approach leads to harsh results.

¶83 We conclude that the meaning of the phrase "all of the amounts in dispute" is ambiguous in this context. The parties advocate different ways to calculate "all of the amounts in dispute," but the plain language does not obviously support either alternative. The phrase generally suggests that "all of the amounts in dispute" should be combined, but it does not include terms necessary to determine whether the parties intended that those amounts be subtracted, added, or otherwise calculated. We therefore must remand this issue to the trial court to consider extrinsic evidence to determine its meaning.

¶84 Having reached this conclusion, we return to Cybertary's argument that the provision must be interpreted to apply separately to each party's respective claims because any other reading leads to harsh or arbitrary results. We acknowledge that regardless of whether "all of the amounts in dispute" is

(…continued)
Again, the plaintiff could recover the entirety of its damages and still be deemed a nonprevailing party under the Employment Agreement.

determined through subtraction or addition, a party could be deemed a "nonprevailing party" under the provision despite having been awarded the entirety of its damages claim. We also note that regardless of whether the subtraction or addition approach is used, there are scenarios under which the party deemed nonprevailing under the provision is the party all would concede is the nonprevailing party under a traditional prevailing party clause.[12] But having discerned no support for the trial court's bifurcated approach in the plain language of the Employment Agreement, we cannot "make a better contract for the parties than they have made for themselves." *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 19, 52 P.3d 1179. "Nor will we avoid the contract's plain language to achieve an 'equitable' result." *Id.* While the trial court interpreted the Employment Agreement to achieve what is arguably a reasonable result, its interpretation was not supported by the provision's plain language. We therefore vacate the trial court's award of fees to Cybertary, and, as noted above, remand the issue for the trial court to decide whether Cybertary is entitled to a fees award after the court determines the parties' intent regarding this ambiguous clause through the consideration of extrinsic evidence.

B.     The Attorney Fees Awarded to Franchise Foundry and Faulconer

¶85     Beckman contends that the trial court erred in employing the reciprocal attorney fees statute, Utah Code section 78B-5-826, to award attorney fees to Franchise Foundry and Faulconer. In particular, Beckman argues that she did not assert claims against Franchise Foundry and Faulconer for breach of the Employment

---

12. For example, if the plaintiff asserted a claim for $100,000 and the defendant counterclaimed for $600,000, and the plaintiff was awarded nothing and the defendant was awarded $600,000, it is unlikely that anyone would challenge a determination that the plaintiff was a nonprevailing party.

Agreement, and thus they could not invoke the reciprocal attorney fees statute to recover attorney fees under the Employment Agreement. Franchise Foundry and Faulconer, in contrast, assert that they are entitled to recover fees pursuant to the Employment Agreement and the reciprocal attorney fees statute because Beckman "asserted a claim for breach of the Employment Agreement against [them]." In their view, "the Employment Agreement formed the premise of Beckman's claim," it would have allowed "Beckman to recover fees had she prevailed," and the reciprocal attorney fees statute therefore "allows Franchise Foundry and Faulconer to recover attorney fees."

¶86    Utah's reciprocal attorney fees statute permits courts to "award attorney fees to the prevailing party of a contract dispute so long as the contract provide[s] for the award of attorney fees to at least one of the parties." *Wing v. Code*, 2016 UT App 230, ¶ 12, 387 P.3d 601. The statute states:

> A court may award costs and attorney fees to either party that prevails in a civil action based upon any promissory note, written contract, or other writing executed after April 28, 1986, when the provisions of the promissory note, written contract, or other writing allow at least one party to recover attorney fees.

Utah Code Ann. § 78B-5-826 (LexisNexis 2012). The text of the statute "provides that a court may award costs and attorney fees to a prevailing party in a civil action if two main conditions are met." *Bilanzich v. Lonetti*, 2007 UT 26, ¶ 14, 160 P.3d 1041. First, "the underlying litigation must be based upon a contract in the sense that a party to the litigation must assert the writing's enforceability as basis for recovery." *Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶¶ 14–15, 285 P.3d 766 (internal quotation marks omitted). And second, the provisions of the contract "must allow at least one party to recover fees if that party had prevailed." *Id.* (internal quotation marks omitted).

¶87 Here, the trial court agreed with Franchise Foundry and Faulconer that the reciprocal attorney fees statute was triggered. The trial court reasoned that because Franchise Foundry and Faulconer "prevailed on Beckman's claim against them under the Employment Agreement" when the court granted them summary judgment on Beckman's first claim for relief, the reciprocal attorney fees statute applied to entitle Franchise Foundry and Faulconer to attorney fees. We disagree. Although Beckman asserted in her amended complaint that Franchise Foundry and Faulconer should be held liable for damages arising out of Cybertary's breach of the Employment Agreement, Beckman did not seek to enforce the Employment Agreement against Franchise Foundry and Faulconer. Thus, the first condition of the reciprocal attorney fees statute was not satisfied. *See id.*

¶88 This conclusion is driven by the nature of Beckman's claim. Beckman labeled her first claim for relief as one for "Breach of Employment Agreement," an agreement she identified in her amended complaint as between Beckman and Cybertary. Beckman claimed that Cybertary breached the Employment Agreement by failing to pay her salary and benefits, and that Franchise Foundry and Faulconer took actions "on behalf of Cybertary" in further breach of the agreement. Beckman also sought a declaration that because Faulconer and Franchise Foundry "have not acted in good faith," they would be "liable for any damages suffered by Beckman as a result of their actions." And in her prayer for relief, Beckman sought a monetary judgment against Cybertary, Franchise Foundry, and Faulconer.

¶89 While Beckman did not clearly articulate the theory under which she sought to recover damages from Franchise Foundry and Faulconer, she did not assert a claim against them for breach

of contract.[13] Beckman never alleged that Franchise Foundry and Faulconer were parties or assignees to the Employment Agreement, and she never alleged that they breached it. Instead, she asserted a claim for declaratory judgment in which she sought a declaration that "Faulconer and Franchise Foundry have not acted in good faith and are therefore liable for any damages suffered by Beckman as a result of their actions." In other words, Beckman sought to recover damages from Franchise Foundry and Faulconer for allegedly failing to act in good faith, but she did not seek to enforce the Employment Agreement against them.

---

13. It appears that Beckman was seeking to hold Franchise Foundry and Faulconer individually liable for Cybertary's breach of the Employment Agreement based on section 48-2c-807(1) of the since-repealed Utah Revised Limited Liability Company Act. It stated, in relevant part,

> (1) A member or manager shall not be liable or accountable in damages or otherwise to the company or the members for any action taken or failure to act on behalf of the company unless the act or omission constitutes: (a) gross negligence; (b) willful misconduct; or (c) a breach of a higher standard of conduct that would result in greater exposure to liability for the member or manager that is established in the company's articles of organization or operating agreement.

Utah Code Ann. § 48-2c-807(1) (LexisNexis 2010) (repealed 2016). In this regard, the jury was instructed at trial that Beckman sought a declaratory judgment that Franchise Foundry and Faulconer "did not act in good faith in either causing Cybertary to not pay her compensation and/or in causing Cybertary to terminate Beckman." The court further instructed that to succeed on her claim, Beckman must demonstrate that Franchise Foundry and Faulconer "acted with 'gross negligence' or 'willful misconduct.'"

¶90   Contrary to what Franchise Foundry and Faulconer now argue on appeal, they previously and unequivocally shared this view. When Defendants moved for summary judgment, they agreed that Beckman's "sole claim regarding the Employment Agreement is that Cybertary—and not anyone else—breached it,"[14] and they even asserted that Beckman "does not, *and has never*, asserted that [breach of contract] claim against any other Defendant." (Emphasis added.) In response, Beckman did not oppose Defendants' motion insofar as it related to Franchise Foundry and Faulconer and the Employment Agreement, because she "openly admit[ted] that Franchise Foundry and Faulconer are not parties [to] the Employment Agreement, and [had] never claimed otherwise."

¶91   On this record, we cannot agree with the trial court's conclusion that Franchise Foundry and Faulconer prevailed on a claim based on the Employment Agreement. We therefore reverse the trial court's award of attorney fees to Franchise Foundry and Faulconer.

C.      Attorney Fees on Appeal

¶92   Last, all of the parties request their attorney fees incurred on appeal. "A party seeking attorney fees for work performed on appeal must state the request explicitly and set forth the legal basis for such an award." Utah R. App. P. 24(a)(9).

¶93   Typically, "when a party who received attorney fees below prevails on appeal, the party is also entitled to fees

---

14. Franchise Foundry and Faulconer's assertion was based on Beckman's response to their interrogatory asking her to identify every agreement that she claimed Defendants breached and which Defendants breached those agreements. Beckman responded: "The parties to the Employment Agreement are Plaintiff and Cybertary. Cybertary breached the Employment Agreement."

reasonably incurred on appeal." *Favero Farms, LC v. Baugh*, 2015 UT App 182, ¶ 25, 356 P.3d 188 (citation and internal quotation marks omitted). Also, generally speaking, the standard contractual provision for the payment of attorney fees to the prevailing party includes attorney fees "incurred by the prevailing party on appeal as well as at trial." *Id.* (citation and internal quotation marks omitted). But the attorney fees provision in the Employment Agreement is unlike the standard contract clause.

¶94 Given the unique nature of the attorney fees provision in the Employment Agreement and the fact that the provision does not expressly speak to attorney fees on appeal, it is unclear how the attorney fees provision might operate with respect to attorney fees incurred during appellate proceedings. And apart from cursory statements that they are entitled to attorney fees under the Employment Agreement, both Beckman and Cybertary have failed to provide analysis explaining why they should receive attorney fees on appeal. *See* Utah R. App. P. 24(a)(9). Accordingly, we deny Beckman's and Cybertary's requests.[15]

¶95 We also deny Franchise Foundry's and Faulconer's requests. Because Franchise Foundry and Faulconer have not prevailed on appeal, they are not entitled to attorney fees on appeal. *See Favero Farms*, 2015 UT App 182, ¶ 25.

## CONCLUSION

¶96 We conclude that Beckman has not shown that the trial court exceeded its discretion in denying her motion for leave to amend her complaint. Nor has she shown that the trial court erred in excluding an audio recording of compromise negotiations under rule 408 of the Utah Rules of Evidence.

---

15. Beckman also requests costs on appeal under rule 34 of the Utah Rules of Appellate Procedure. We decline to award them.

¶97 Beckman has shown harmful error, however, in the trial court's decision to instruct the jury on the parties' relative burdens of proof in connection with her claim that Cybertary wrongfully terminated her employment. Because the parties did not incorporate a good business judgment standard into the Employment Agreement, the trial court erred in instructing otherwise, and we reverse and remand for a new trial on her wrongful termination claim.

¶98 We further conclude that the trial court erroneously denied Beckman's request for prejudgment interest. Accordingly, we reverse the court's order and instruct the court to calculate the appropriate amount of prejudgment interest on remand.

¶99 With regard to the attorney fees awarded to Cybertary, we vacate that award. We conclude that the Employment Agreement's attorney fees provision is ambiguous and that the trial court should reassess the issue, if necessary, after determining the parties' intent regarding the provision through the consideration of extrinsic evidence and after retrial of Beckman's wrongful termination claim. Finally, because the court misapplied the reciprocal attorney fees statute, we reverse its award of attorney fees to Franchise Foundry and Faulconer.

¶100 In sum, we affirm in part, reverse in part, vacate in part, and remand for further proceedings.

———————